**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**Myron Levin,**

*Plaintiff*,

v.

**National Highway Traffic Safety Administration,**

*Defendant.*

1:20-cv-03236-JMC

**Oral Argument Requested**

# MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

John Harland Giammatteo (Bar ID NY0438)
Stephanie K. Glaberson (Bar ID 177092)
David C. Vladeck (Bar ID 945063)
Georgetown University Law Center
Civil Litigation Clinic
600 New Jersey Avenue, NW, Room 312
Washington, D.C. 20001
(202) 662-9545
John.Giammatteo@georgetown.edu

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ........ iii

**INTRODUCTION** ........ 1

**BACKGROUND** ........ 2

I. NHTSA publishes its Phase 2 Guidelines and seeks public comment. ........ 2

II. Mr. Levin requests further information from the agency and, after NHTSA repeatedly fails to respond, files this lawsuit. ........ 3

III. NHTSA produces heavily-redacted records and a cursory *Vaughn* Index. ........ 5

**STANDARD OF REVIEW** ........ 7

**ARGUMENT** ........ 7

I. NHTSA has failed to meet its burden to withhold records under Exemption 5. ........ 9

A. NHTSA has failed to demonstrate that the records it withholds are deliberative. ........ 10

2. NHTSA's conclusory submissions fail to demonstrate the role the withheld records played in any decisional process. ........ 15

3. NHTSA has not provided any information about the decisionmaking authority of the individuals issuing the documents. ........ 16

4. NHTSA must disclose factual information. ........ 17

B. NHTSA failed to demonstrate that the records are subject to the attorney-client communication or work product privileges. ........ 19

1. The *Vaughn* Indices and partial disclosures provided by NHTSA are insufficient to justify NHTSA's use of the attorney-client communication privilege. ........ 20

2. The Vaughn indices and partial disclosures provided by NHTSA are insufficient to justify NHTSA's use of the attorney work-product communication privilege. ........ 23

II. NHTSA has not met its burden to demonstrate that foreseeable harm would result from release of these records. ........ 24

A. NHTSA has not described *any* harm that would result from release of multiple responsive records. ........ 26

B. NHTSA's boilerplate invocations of the policy considerations underpinning the deliberative process privilege do not establish foreseeable harm. ........ 28

1. The agency relies on boilerplate language. ........ 28

2. The agency fails to allege specific harms relating to specific groups of documents. ........ 30

3. Where NHTSA does describe specific harms, it fails to connect those harms to the withheld records. ..................................................................... 31

III. NHTSA did not provide an adequate justification for failing to disclose segregable information. ................................................................................................ 33

**CONCLUSION ........................................................................................................ 35**

## TABLE OF AUTHORITIES

**CASES**

*100Reporters LLC v. United States Dep't of Just.*,
248 F. Supp. 3d 115 (D.D.C. 2017) ---------- 11, 12, 15

*Access Reports v. Dep't of Justice*,
926 F.2d 1192 (D.C. Cir. 1991)---------- 16, 17

*Ancient Coin Collectors Guild v. U.S. Dep't of State,*
641 F.3d 504 (D.C. Cir. 2011) ----------17

*Campbell v. U.S. Dep't of Justice*,
164 F.3d 20 (D.C. Cir. 1998)----------20

*Coastal States Gas Corp. v. Dep't of Energy*,
617 F.2d 854 (D.C. Cir. 1980) ---------- passim

*Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*,
452 F.3d 798 (D.C. Cir. 2006) ----------24

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
No. CV 18-0342 (ABJ), 2021 WL 1209221 (D.D.C. Mar. 31, 2021) ----------17

* *Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*,
436 F. Supp. 3d 90 (D.D.C. 2019)---------- passim

*Defs. of Wildlife v. U.S. Border Patrol*,
623 F. Supp. 2d 83 (D.D.C. 2009)---------- 8

*Elec. Frontier Found. v. U.S. Dep't of Just.*,
826 F. Supp. 2d 157 (D.D.C. 2011) ----------15

*Ellis v. U.S. Dep't of Justice*,
110 F.Supp.3d 99 (D.D.C. 2015) ----------23

*Hayden v. National Sec. Agency*,
608 F.2d 1381 (D.C.Cir.1979) ----------20

*Hunton & Williams LLP v. U.S. Env't Prot. Agency*,
248 F. Supp. 3d 220 (D.D.C. 2017) ---------- 21, 23

*In re Sealed Case*,
737 F.2d 94 (D.C. Cir. 1984)----------20

* *Judge Rotenberg Educ. Ctr., Inc. v. U.S. Food & Drug Admin.*,
376 F. Supp. 3d 47 (D.D.C. 2019)------------------------------------------------------------------11

*Machado Amadis v. United States Dep't of State*,
971 F.3d 364 (D.C. Cir. 2020) ---------------------------------------------------------------------25

*Mapother v. Dep't of Justice*,
3 F.3d 1533 (D.C. Cir. 1993)-----------------------------------------------------------------------17

*Montrose Chem. Corp. of California v. Train*,
491 F.2d 63 (D.C. Cir. 1974-----------------------------------------------------------------------17

*N.L.R.B. v. Robbins Tire & Rubber Co.*,
437 U.S. 214 (1978)---------------------------------------------------------------------------------- 8

*N.L.R.B. v. Sears, Roebuck & Co.*,
421 U.S. 132 (1975)-------------------------------------------------------------------------------- 8, 9

*Nat'l Ass'n of Home Builders v. Norton*,
309 F.3d 26 (D.C. Cir. 2002)------------------------------------------------------------------------ 7

*Petroleum Info. Corp. v. U.S. Dep't of Interior*,
976 F.2d 1429 (D.C. Cir. 1992)--------------------------------------------------------------- 7, 15

*Prop. of the People, Inc. v. Off. of Mgmt. & Budget,*
330 F. Supp. 3d 373 (D.D.C. 2018) ----------------------------------------------------------------18

*Pub. Emps. for Env't Resp. v. U.S. Env't Prot. Agency*,
211 F. Supp. 3d 227 (D.D.C. 2016) ----------------------------------------------------------------22

*Quarles v. Dep't of Navy*,
893 F.2d 390 (D.C. Cir. 1990) ---------------------------------------------------------------------19

* *Reps. Comm. for Freedom of the Press v. Fed. Bureau of Investigation*,
3 F.4th 350 (D.C. Cir. 2021) ---------------------------------------------------------------- passim

*Rosenberg v. Department of Defense*,
342 F. Supp. 3d 62 (D.D.C. 2018)------------------------------------------------------------- 26, 33

*Sierra Club v. United States Fish & Wildlife Serv.*,
523 F. Supp. 3d 24 (D.D.C. 2021)------------------------------------------------------ 17, 33, 34

*Tax Analysts v. IRS*,
117 F.3d 607 (D.C. Cir. 1997) ---------------------------------------------------------------- 20, 21

*United States Fish & Wildlife Serv. v. Sierra Club, Inc.*,
141 S. Ct. 777 (2021) ---------------------------------------------------------------------------------10

*United States v. Deloitte LLP*,
610 F.3d 129 (D.C. Cir. 2010) -------------------------------------------------------------------------23

*Vaughn v. Rosen*,
523 F.2d 1136 (D.C. Cir. 1975)------------------------------------------------------------------------10

*Wilderness Soc'y v. Dep't of Interior*,
344 F. Supp. 2d 1 (D.D.C. 2004) ---------------------------------------------------------------------34

**STATUTES**

49 U.S.C. § 30101 ------------------------------------------------------------------------------------ 2, 13

5 U.S.C. § 552------------------------------------------------------------------------------------------ passim

*FOIA Improvement Act of 2016,* Pub. L. 114-185, 130 Stat. 538 (2016) ----------------------------24

**REGULATIONS**

*Visual-Manual NHTSA Driver Distraction Guidelines for In-Vehicle Electronic Devices*,
78 Fed. Reg. 24817 (finalized April 26, 2013) --------------------------------------------------- 2, 13

*Visual-Manual NHTSA Driver Distraction Guidelines for Portable and Aftermarket Devices*,
81 Fed. Reg. 87656, 87657-8 (Dec. 5, 2016) ------------------------------------------------------- 2, 3

**OTHER AUTHORITIES**

S. Rep. No. 4, 114th Cong., 1st Sess. 2 (2015) ----------------------------------------------------------24

## INTRODUCTION

Alarmed by a dramatic increase in traffic fatalities caused by distracted driving, the National Highway Traffic Safety Administration ("NHTSA") proposed a "safety framework" for cell-phones and other electronic devices. Known as the "Phase 2 Guidelines," the proposals aimed to "reduce the potential for unsafe driver distraction." NHTSA requested public comment by February 2017, but then: nothing happened. The comment period came and went. NHTSA went silent. Years passed; NHTSA failed to make public any information regarding the project or its evident decision to shelve it.

This is a Freedom of Information Act ("FOIA") case about what happened to the Phase 2 Guidelines. Several years after it appeared that NHTSA abandoned work on the Guidelines, journalist Myron Levin ("Mr. Levin" or "Plaintiff") sought an accounting of where the proposals stood. But NHTSA refused to answer, ignored his requests and—only after the initiation of this lawsuit—provided thousands of blank or heavily redacted pages. NHTSA claims to have fulfilled Mr. Levin's request and that FOIA's Exemption 5 justifies its withholdings.

Not so. As Mr. Levin demonstrates below, accepting NHTSA's position here would allow Exemption 5 to swallow virtually all of FOIA whenever an agency undertakes a multiyear policy project. It would allow government actors to quietly kill controversial projects yet shield their interference with vague claims that the dead initiatives "remained in an internal and pending status." NHTSA has also failed to show that disclosure would cause the agency foreseeable harm. Accepting NHTSA's position would render the foreseeable harm requirement coextensive with the Exemption 5 inquiry, a result incompatible with the statute and in conflict with the growing consensus in this District. This Court should grant summary judgment to Mr. Levin and order the agency to release the remaining records responsive to his FOIA request.

## BACKGROUND

This is an action under the Freedom of Information Act, 5 U.S.C. § 552, about records relating to the Phase 2 Driver Distraction Guidelines, part of NHTSA's Blueprint for Ending Distracted Driving. Plaintiff Myron Levin is an experienced investigative journalist who focuses on consumer safety and government oversight. *See* Declaration of Plaintiff Myron Levin ¶ 1 (Nov. 19, 2021) ("Levin Decl."). Defendant NHTSA is the government agency tasked by Congress "to reduce traffic accidents and deaths and injuries resulting from traffic accidents." 49 U.S.C. § 30101.

### I. NHTSA publishes its Phase 2 Guidelines and seeks public comment.

According to NHTSA, thousands of people die each year as a result of distracted driving—when drivers focus their attention away from driving and focus on another activity, such as texting or emailing on a smartphone. *Visual-Manual NHTSA Driver Distraction Guidelines for Portable and Aftermarket Devices*, 81 Fed. Reg. 87656, 87657-8 (Dec. 5, 2016), ("Phase 2 Guidelines"), ECF No. 20-4. The agency attributes ten percent of all 2015 traffic fatalities to the phenomenon. *Id*. at 87657. To combat this epidemic, NHTSA promulgated its Blueprint for Ending Distracted Driving in 2012, calling it a "comprehensive approach to the distraction problem," including the "development of non-binding, voluntary guidelines for in-vehicle and portable devices" that contributed to driver distraction. *Id.* at 87658. As a part of this initiative, NHTSA proposed industry guidelines in two phases.

NHTSA proposed the first phase of the guidelines in February 2012 and finalized it in April 2013. *See Visual-Manual NHTSA Driver Distraction Guidelines for In-Vehicle Electronic Devices*, 78 Fed. Reg. 24817 (finalized April 26, 2013). The first phase provided recommendations for minimizing the potential distraction from a vehicle's audio systems, navigation systems and other "original equipment" that came installed in a vehicle. *Id.* Phase 1

was also intended to serve as the foundation for the next phase, the Phase 2 Guidelines, which would apply to after-market devices like cell-phones and other portable devices.

NHTSA proposed its Phase 2 Driver Distraction Guidelines ("Phase 2 Guidelines") in December 2016. *See* Phase 2 Guidelines at 87656. Through the new proposals, the agency sought to "provide a safety framework for developers of portable and aftermarket electronic devices to use when developing visual-manual user interfaces for their systems." *Id.* The guidelines proposed "two concurrent approaches" to provide that safety framework. *Id.* First, the agency recommended that portable devices like cell-phones be easily pairable with a vehicle's equipment, thus reducing the amount of time a driver would have to look at the portable device and ensuring that certain features were inaccessible while driving. *Id.* Second, it recommended that device developers include a "Driver Mode" that would provide a simplified interface to reduce distraction while a vehicle was in motion. *Id.*

The agency noted that it had already met with industry stakeholders and others as it had developed the proposed Phase 2 Guidelines. It welcomed additional public comment, however, and set the close of public commenting for February 3, 2017. *Id.* at 87656. The public comment period came and went, yet NHTSA never issued the final Phase 2 Guidelines nor explained their fate.

## II. Mr. Levin requests further information from the agency and, after NHTSA repeatedly fails to respond, files this lawsuit.

Mr. Levin has frequently reported on issues related to distracted driving and the increasing risks accompanying smartphones. *See* Levin Decl. ¶¶ 2-6. In 2017, Mr. Levin reported on the furious pushback from the communications technology industry to the Phase 2 Guidelines. *See id.* ¶ 4. At the time, NHTSA officials indicated they were actively reviewing the public comments. Two years later, in 2019, Mr. Levin again contacted NHTSA as he prepared a story

about distracted driving. *See* Levin Decl. ¶ 5. NHTSA did not respond, but even after going to press Mr. Levin continued to follow up with NHTSA trying to find out the status of the Phase 2 Guidelines. In e-mails to the agency, he noted that he sought answers to what he thought were "pretty straightforward" questions: had the agency published anything following up since the proposed guidelines in 2016 and, if not, what was "the status of the guidelines and next steps, if any." *See* NHTSA-ES19-004222-000876, Declaration of John Harland Giammatteo ("Giammatteo Decl."), Ex. A. The agency did not answer.

The Phase 2 Guidelines—and whether NHTSA's has halted work on them—was a newsworthy story and, as a result, one that Mr. Levin continued to report. Levin Decl. ¶ 7. After trying to get answers to his questions and getting no traction with the agency, he reluctantly submitted a FOIA request to NHTSA on December 12, 2019. *See* Levin Decl. ¶¶ 9-11. In his request, Mr. Levin sought "copies of all records that relate to the proposed guidelines and that were created or received from February 3, 2017, to the present." *See* Freedom of Information Act Request (Dec. 12, 2019), ECF No. 20-6. He asked that NHTSA's response include "copies of all emails, letters, memos, reports, phone slips, power points, meeting agendas, sign-in sheets, and all other writings in NHTSA and DOT files that mention, discuss, reference, or comment on the proposed guidelines and possible next steps." *Id.* He also requested a phone call with the FOIA officer assigned to his request to try and limit the scope of the request. *Id.*

After submitting his request, Mr. Levin repeatedly tried to speak with the NHTSA FOIA officers handling his request. *See* Levin Decl. ¶¶ 12. They either did not respond or, on the rare occasion Mr. Levin was able to get someone on the phone, would only say that they were working on a response. *Id.* ¶¶ 12-16. They provided no timeline for when the agency would produce responsive records. *Id.*

After getting nowhere with NHTSA for nearly a year, Mr. Levin filed his Complaint with this Court seeking "to compel [NHTSA] to release records relating to NHTSA's proposed guidelines to minimize driver distraction from hand-held portable and aftermarket electronic devices while driving" on November 10, 2020. *See* Complaint ¶ 1, ECF No. 1.[1]

### III. NHTSA produces heavily-redacted records and a cursory *Vaughn* Index.

In April 2021—five months after Mr. Levin filed his complaint and sixteen months after his FOIA request—NHTSA finally provided what it claimed was a final response. *See* Levin Decl. ¶ 18-20. The response consisted of a single PDF of 3,852 pages. Most of the pages were either partially redacted or withheld in full. And NHTSA provided no information as to the number of records included or where one record ended and another began. *Id.*

After Mr. Levin expressed concern with the adequacy of this response, the agency eventually agreed to provide *Vaughn* Indices for both the withheld records and the partial redactions. *See Vaughn* Index: Index A (July 9, 2021), ECF No. 20-7 ("*Vaughn* Index A"); *Vaughn* Index: Index B (July 16, 2021), ECF No. 20-8 ("*Vaughn* Index B"). The agency provided the *Vaughn* Indices in July 2021, along with ten additional records it claimed it discovered could now be produced in unredacted form. *Id.* Included in that disclosure was Mr. Levin's own e-mail following up with the agency about the status of the Phase 2 Guidelines, which NHTSA had originally redacted. *Vaughn* Index B at 1 (noting disclosure of NHTSA-ES19-004222-000876).

Mr. Levin reached out to NHTSA through counsel to once again try to limit his request. He emphasized that, as a journalist, his goal was to understand why the guidelines were

---

[1] The lawsuit originally was filed on behalf of Mr. Levin and FairWarning, Inc., an investigative news organization that focused on consumer issues and related topics of government and business accountability. *See* Complaint ¶ 3, ECF No. 1. FairWarning dissolved as of February 20, 2021 and was dismissed from the case. *See* Notice of Dismissal, ECF No. 10.

abandoned. Levin Decl. ¶ 21. Mr. Levin posed a series of questions to NHTSA which, he told NHTSA, would resolve the dispute if answered. The questions included:

> 1. Why was the decision made to not go forward with the Phase II guidelines? When was the decision made? Was the decision not to proceed made by, or at the direction of, the Office of the Secretary, OMB/OIRA or within NHTSA? Provide records indicating why and when the decision was made, and who made it.
>
> 2. Why did NHTSA decide not to announce and explain its decision not to issue the Phase II guidelines?
>
> 3. The comments filed by industry groups opposed the issuance Phase II guidelines. Did their opposition influence the decision to abandon the proposal? And did the industry threaten litigation if NHTSA issued Phase II guidance?
>
> 4. NHTSA and the Volpe Center staff prepared a summary of public comments on Phase II guidelines. Why wasn't the comment summary made public? And does NHTSA have any record of the time and money spent on preparing the summary? If so, provide those records.
>
> 5. DOT and NHTSA have praised the potential safety benefits of autonomous vehicles. Fully autonomous vehicles would obviate the need to address human mistakes, such as driver distraction related to use of cell phones and entertainment features. Did DOT and NHTSA assume that autonomous vehicles were on the near horizon, and did that assumption factor into the decision to abandon the Phase II guidelines?
>
> 6. NHTSA contracted with Battelle, Ohio State University, and perhaps other entities, to (1) develop a test for compliance with the Phase I guidelines on built-in infotainment features; and (2) to test some production vehicles for compliance. Please describe that work, and what became of it. There are, we assume, public RFPs that describe the work conducted by these contractors. Were any of the results published? Was there any opposition to this work by members of the auto industry? If the work was abandoned, what were the reasons? And how much money did NHTSA spend on this effort?

*See* Levin Decl. ¶ 21.

The agency rejected this offer, claiming that even the status of the Phase 2 Guidelines was deliberative, *id.* ¶ 22, and the parties proceeded to summary judgment.

## STANDARD OF REVIEW

"FOIA mandates a strong presumption in favor of disclosure . . . and . . . the statutory exemptions, which are exclusive, are to be narrowly construed." *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 32 (D.C. Cir. 2002) (internal citations and quotation marks omitted). An agency bears the burden of demonstrating that requested material falls within an exemption and is shielded from release. *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1433 (D.C. Cir. 1992). Even if an exemption applies, an agency can withhold records "only if" it demonstrates harm foreseeable from release. 5 U.S.C § 552(a)(8).

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." This Court reviews agency FOIA decisions *de novo*. *Se*e 5 U.S.C. § 552(a)(4)(B).

## ARGUMENT

This case is about whether FOIA's Exemption 5 can frustrate the public right to government records whenever an agency undertakes a multiyear policy project. NHTSA asks this Court to disregard the agency's failure to prove it would be harmed in any way by disclosing the relevant records in this case. Instead, the agency wants the Court to ratify its extremely broad interpretation of Exemption 5—an interpretation that would swallow FOIA whole whenever an agency undertakes rulemaking or formulates guidelines. This Court should decline to do so.

FOIA was enacted "to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to

the governed." *N.L.R.B. v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978); *see also Defs. of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009) ("The fundamental purpose of the FOIA is to assist citizens in discovering *what their government is up to*." (emphasis in original)).

Under FOIA, "virtually every document generated by an agency is available to the public in one form or another" unless it falls within a specific, narrow exemption. *N.L.R.B. v. Sears, Roebuck & Co*., 421 U.S. 132, 136 (1975). Exemption 5 permits an agency to withhold deliberative information, as well as attorney-client communication or attorney client work-product. *See* 5 U.S.C. § 552(b)(5); *N.L.R.B.*, 421 U.S. at 149. An agency can only do so, however, if it meets its burden to demonstrate it would be harmed by disclosure. 5 U.S.C § 552(a)(8).

NHTSA has failed to meet its burden. The agency argues that Exemption 5 shields its release of any information tangentially related to the Phase 2 Guidelines.[2] But its argument fails for several reasons. *First*, NHTSA has failed to show that the records it refuses to disclose are actually within the scope of Exemption 5's deliberative process privilege. It seeks to hide years of documents because, at most, they "relate to" a similar subject as one on which the agency has considered adopting guidelines. But "relate to" is not the standard. NHTSA has not demonstrated any nexus between those documents and the deliberations themselves, and it has not described the subsidiary deliberative processes involved and whether the records reflect the culmination of those subsidiary processes. It also has not identified the agency personnel who drafted or

[2] The agency separately seeks to withhold documents as trade secrets within the meaning of Exemption 4, and several partial redactions based on Exemption 6. Mr. Levin does not challenge NHTSA's withholdings pursuant to those exemptions.

received each of the documents it seeks to withhold. It has therefore failed to show that the documents are, in fact, deliberative at all. It also seeks to shield factual information, which ordinarily is outside the scope of the deliberative process privilege. *Second,* it has failed to demonstrate Exemption 5's attorney-client privilege or attorney work product privileges apply. *Third*, even assuming any records properly fall within Exemption 5, NHTSA has failed to demonstrate any foreseeable harm from disclosure. That heightened standard requires agencies to demonstrate specific, concrete harms addressing particular documents or groups of documents. NHTSA here fails to put forward any theory of harm. Nor could it, given that what Mr. Levin seeks primarily are answers about the status and not the substance of agency deliberations. *Finally*, the agency has failed to show that it segregated and disclosed nonexempt information.

This Court should reject NHTSA's overbroad reading of Exemption 5 and instead order the agency to release responsive records to Mr. Levin or, alternatively, order NHTSA to provide a representative sample of the withheld records for this Court's *in camera* review and subsequent release.

## I. NHTSA has failed to meet its burden to withhold records under Exemption 5.

FOIA's Exemption 5 shields "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). The exemption imports privileges that an agency could traditionally assert in discovery, including attorney work-product and attorney-client privileges, and the deliberative process privilege. *N.L.R.B.*, 421 U.S. at 149.

NHTSA withholds in full 121 records under the deliberative process privilege and 20 records under the attorney work-product and attorney-client communications privileges. It withholds in part hundreds of other records under each privilege.

### A. NHTSA has failed to demonstrate that the records it withholds are deliberative.

To trigger the deliberative process privilege, an agency must prove two things. First, it must demonstrate that the specific records it withholds are predecisional, that is, that the information was "generated before the agency's final decision on the matter." *United States Fish & Wildlife Serv. v. Sierra Club, Inc*., 141 S. Ct. 777, 786 (2021). Second, "the document must be a direct part of the deliberative process in that it makes recommendations or expresses opinions on legal or policy matters" and "must also be a part of the agency give-and-take of the deliberative process by which the decision itself is made." *Vaughn v. Rosen*, 523 F.2d 1136, 1144 (D.C. Cir. 1975).

The agency bears the burden of demonstrating the deliberative process privilege applies. *Reps. Comm. for Freedom of the Press v. Fed. Bureau of Investigation*, 3 F.4th 350, 357-58 (D.C. Cir. 2021). To meet its burden, NHTSA must, at a minimum, describe "(1) what deliberative process is involved, (2) the role played by the documents in issue in the course of that process, and (3) the nature of the decisionmaking authority vested in the office or person issuing the disputed documents, and the positions in the chain of command of the parties to the documents." *Ctr. for Investigative Reporting v. U.S. Customs & Border Prot*., 436 F. Supp. 3d 90, 101 (D.D.C. 2019) (internal citations, alternations and quotation marks omitted). NHTSA has failed to meet its burden.

#### 1. NHTSA has failed to identify the deliberative process involved.

The only deliberative process that NHTSA points to here is the Phase 2 Guidelines process—a policy it first proposed in 2016 and it claims is still pending—even as NHTSA appears to have abandoned the Guidelines. *See, e.g.*, Def. MSJ Br. at 12. Any agency policymaking process is not a single process, however, but a series of smaller deliberative

processes that produce a final agency policy. It is NHTSA's responsibility to identify, with specificity, the precise deliberative process it claims is involved. *See Ctr. for Investigative Reporting*, 436 F. Supp. 3d 90 at 101. It has not identified those subsidiary processes, and therefore failed to justify withholding here.

"If agencies could shield from review thousands of agency records because a years-long rule-making was underway, the deliberative-process privilege would be the exemption that ate the entire FOIA disclosure scheme." *Judge Rotenberg Educ. Ctr., Inc. v. U.S. Food & Drug Admin.*, 376 F. Supp. 3d 47, 67 (D.D.C. 2019). As a result, courts in this District have repeatedly required that agencies specify the *subsidiary* processes that make up broader policy formation, and release records where the records document the culmination of the subsidiary process itself. *See Ctr. for Investigative Reporting*, 436 F. Supp. 3d 90 at 101; *Judge Rotenberg Educ. Ctr.,* 376 F. Supp. 3d at 67; *100Reporters LLC v. United States Dep't of Just.*, 248 F. Supp. 3d 115, 153 (D.D.C. 2017).

In *Judge Rotenberg Education Center*, for instance, plaintiffs sought information about a proposed FDA rule that would ban electrical stimulation devices the Center used to treat its patients. 376 F. Supp. 3d at 53. The FDA claimed that its invocation of Exemption 5 was proper because the information plaintiffs sought related to its pending rulemaking, and that where the FDA had failed to identify a specific process the withheld records "should be treated as related to deliberation about the content of the Proposed Ban." *Id*. at 67. The district court rejected that argument, reasoning that the agency had failed to adequately identify its decisionmaking process because the "withheld records may in fact pertain to a litany of subsidiary decisions that defendants fail to acknowledge." *Id.*

Similarly, in *Center for Investigative Reporting*, a court in this District found that U.S. Customs and Border Protection had not carried its burden when it attempted to shield documents related to "administering the evolving and ongoing border wall contracting, procurement, and construction process." 436 F. Supp. 3d at 101. The court reasoned that the procurement process involved multiple subsidiary decisions, and it was likely that "the documents at issue might themselves be final subsidiary agency decisions." *Id.* at 102; *see also 100Reporters LLC*, 248 F. Supp. 3d at 153 (finding that each separate work plan constituted "a separate sub-decision—with a distinct deliberative process," rather than one overarching process for agency to monitor compliance with a settlement agreement).

NHTSA cannot use the asserted pending nature of the Phase 2 Guidelines to create a "four-year umbrella" over every document that relates in some way to the Guidelines or its subject matter of "distracted driving." *100Reporters LLC*, 248 F. Supp. 3d at 153. The agency's own filings in this case suggest multiple subsidiary decisions, and some of the records the agency seeks to withhold are likely to reflect the *culmination* of subsidiary processes that should properly be disclosed under FOIA. *See Ctr. for Investigative Reporting,* 436 F. Supp. 3d at 102. The agency identifies multiple documents as deliverables from contractors, for instance, or presentations from agency staff or contractors. *See, e.g.*, Humphrey Decl. ¶ 42. For example, NHTSA highlights NHTSA-ES19-004222-001332-42, describing it as an email chain pertaining to a media inquiry that does not address Phase 2 at all. *See* Humphrey Decl. ¶ 37. For the agency to meet its burden, it would have to identify, in detail, each subsidiary process and connect the withheld records to that specific process showing that the withheld documents in fact reflected deliberations, as opposed to culminations, of each process. It has failed to do so here.

Additionally, even assuming that the "Phase 2 Guidelines" could constitute a sufficiently specific deliberative process for purposes of the exemption, the agency has not connected many of the records it withholds to that process. Instead, the agency's *Vaughn* Indices and declarations merely suggest that the records touch on the same subject matter as the Phase 2 Guidelines. The *Vaughn* Indices suggest the documents broadly address "driver distraction issues," without locating those issues in any particular deliberative process:

- "Draft meeting agenda regarding internal meeting between NHTSA and contracts *concerning driver distraction issues*." *See* NHTSA-ES19-004222-000014 (emphasis added).
- "Presentation and agenda for NHTSA, created by agency contracted company, *concerning activities regarding driver distraction*." *See* NHTSA-ES19-004222-000186 (emphasis added).
- "Annotated copy of NHTSA presentation *summarizing driver distraction fleet issues*. The copy contains comments and notes from internal NHTSA personnel regarding content and impressions." *See* NHTSA-ES19-004222-000248–284 (emphasis added).
- "Internal notes, calendar invite, and anticipated summary of meeting regarding Agency activities *relating to evaluation of driver distraction measurements*." *See* NHTSA-ES19-004222-001327–328 (emphasis added).
- "Internal email chain between personnel at NHTSA and Volpe regarding potential activities, timing, and scopes of work *relating to driver distraction issues*." *See* NHTSA-ES19-004222-003704-003705 (emphasis added).

At most the descriptions establish that the documents touch on the same topic as the Phase 2 Guidelines, not that they are part of the agency's deliberative process for debating what the content of the Guidelines will be. Driver distraction is a broad topic, and one likely of central concern for an agency with a mandate to "reduce traffic accidents and deaths and injuries resulting from traffic accidents." *See* Fish Decl. ¶ 8 (quoting 49 U.S.C. § 30101). NHTSA has already published one set of guidelines about distracted driving. *See* Visual-Manual NHTSA Driver Distraction Guidelines for In-Vehicle Electronic Devices, 78 FR 24817 (finalized April 26, 2013). The agency also states that it continues to develop its research on distracted driving

generally, and prepare reports and disseminate reports on the topic separate from the Phase 2 process. *See* Fish Decl. ¶ 17. The descriptions in its *Vaughn* Indices could equally apply to records addressing Phase 1 or NHTSA's subsequent distract driving research, and thus not be part of the agency's Phase 2 deliberations at all.

Even if the Phase 2 Guidelines process is properly considered within Exemption 5, any records reflecting the culmination of that process would still have to be turned over. For instance, NHTSA's own production in this case undermines its self-serving claim that the Phase 2 Guidelines "remained in an internal and pending status," Humphrey Decl. ¶ 33, NHTSA's own production in this case undermines that claim. The most recent record in *Vaughn* Index A, for instance, is dated May 2019,[3] well before Mr. Levin's December 2019 request for all documents from February 3, 2017 "to the present." *See id*. And many of the more recent records in the production, according to NHTSA's indices, do not reflect any substantive agency work, but instead are described as media inquiries that, like Mr. Levin's, either sought updates on the status of the proposals or just addressed driver distraction issues generally.

Mr. Levin primarily seeks information about the status of the Phase 2 Guidelines, including its current status and next steps. Levin Decl. ¶¶ 21, 23. If a NHTSA administrator ordered work on the Phase 2 Guidelines to stop completely, or put the project on pause, records reflecting that action would show the culmination of a subsidiary decisionmaking process that the agency would have to disclose, yet has not done so here.

[3] One document is listed as March 13, 2021. *See Vaughn* Index A at 5 (stating date of March 13, 2021 for NHTSA-ES19-004222-001163-64). This appears to be an error, given that NHTSA notes that it was attached to the proceeding e-mail, which is dated March 14, 2019, not 2021. *See* NHTSA-ES19-004222-001162, Giammatteo Decl., Ex. B.

Finding that the agency met its burden here would result in precisely the sweeping exemption that courts in this District have repeatedly rejected. It would create a multiyear "umbrella effectively shielding all agency action from review" merely because the FOIA request (a) touched on an issue area within NHTSA's bailiwick and (b) the agency had considered doing some formal rulemaking or issuing guidance on the subject, at some point in time. *100Reporters LLC*, 248 F. Supp. 3d at 153. This Court should decline the agency's attempts to do so here.

**2. NHTSA's conclusory submissions fail to demonstrate the role the withheld records played in any decisional process.**

Agencies must explain the role the withheld documents played in the deliberative process. *Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 101. Providing a vague *Vaughn* index, without specifying how records played into the agency's deliberative process, is not enough. *See, e.g.*, *Elec. Frontier Found. v. U.S. Dep't of Just.*, 826 F. Supp. 2d 157, 167-8 (D.D.C. 2011). To fall within the deliberative process privilege, "materials must bear on the formulation or exercise of agency policy-oriented *judgment*." *Petroleum Info. Corp*, 976 F.2d at 1435 (emphasis in original). In other words, the records must "bear on" the agency's formation of policy itself.

NHTSA fails to meet its burden to demonstrate that the documents are deliberative at all. Instead, NHTSA's filings demonstrate that it seeks to apply the "deliberative" label in ways that expand its scope far beyond the formation of policy. In fact, many of the records address the type of routine agency work that is regularly disclosed under FOIA. NHTSA says it withheld records, for instance, that documented the "day-to-day activities of staff level agency personnel" or "provided supervisors and colleagues status updates on projects, suggested future tasks in need of completion." *See* Humphrey Decl. ¶ 42. It seeks to shield the "substance of procurement requests," for instance, Humphrey Decl. ¶ 44, or "materials . . . prepared to inform

NHTSA staff on the status and scope of projects." *Id.* ¶ 43. It withholds "deliverable[s] . . . from contractors." *Id.* ¶ 42.

NHTSA has not shown that any of these records are properly withheld under exemption 5. It has offered no meaningful explanation for how these documents reflect the necessary deliberations through which NHTSA will formulate the final *substance* of the Phase 2 Guidelines. To the contrary, NHTSA's descriptions show that many of these records instead reflect the culmination of subsidiary decisional processes, decisions or statements involving logistics, scheduling, or other "routine operating decisions," none of which is protected from disclosure. The agency therefore has not demonstrated that these documents would reveal any exercise of the agency's policy-oriented judgment.

**3. NHTSA has not provided any information about the decisionmaking authority of the individuals issuing the documents.**

The D.C. Circuit and courts in this District have repeatedly required clarity on the authors and recipients of withheld records, including who the relevant decisionmakers are, before permitting an agency to shield a record from disclosure. *See, e.g.*, *Access Reports v. Dep't of Justice*, 926 F.2d 1192, 1195 (D.C. Cir. 1991); *Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 102–03. Decisionmaking authority is critical because "[a] document from a junior to a senior is likely to reflect his or her own subjective opinions and will clearly have no binding effect on the recipient. By contrast, one moving from senior to junior is far more likely to manifest decisionmaking authority and to be the denouement of the decisionmaking rather than part of its give-and-take." *Access Reports*, 926 F.2d at 1195.

Here, NHTSA has not identified the author and recipients of the majority of the records it withholds. The *Vaughn* Indices almost never identify who specific records were prepared for or shared with. The declarations only specify the direction in which the documents flow for a

limited subset of documents, *see, e.g.*, Humphrey Decl. ¶¶ 38, 39, or name staff involved in the process as a whole without linking staff members to individual records. Fish Decl. ¶ 16. Likewise, numerous records involve agency coordination with third-parties. The agency fails to describe these parties, however, and does not describe their relationship with the agency or the scope of their duties.

NHTSA has "made essentially no effort to satisfy the 'key feature' by identifying 'the relation between the author and recipients of the document.'" *Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 103 (quoting *Access Reports*, 926 F.2d at 1195). It has therefore not met its burden to demonstrate Exemption 5 applies.

**4. NHTSA must disclose factual information.**

Purely factual information is generally not deliberative and therefore outside the scope of Exemption 5. *See, e.g.*, *Ancient Coin Collectors Guild v. U.S. Dep't of State,* 641 F.3d 504, 513 (D.C. Cir. 2011). An agency may only withhold factual information if the agency shows the records rely on an employee's "evaluation of the relative significance of the facts recited in the record" or where that employee is "separating the pertinent from the impertinent." *Montrose Chem. Corp. of California v. Train*, 491 F.2d 63, 68 (D.C. Cir. 1974). Factual information might be deliberative where it reflects "exercise of discretion and judgment calls." *Ancient Coin Collectors Guild*, 641 F.3d at 513 (*quoting Mapother v. Dep't of Justice*, 3 F.3d 1533 (D.C. Cir. 1993)). In documents that contain both factual information and deliberative information, the agency must "take reasonable steps necessary to segregate and release nonexempt information." 5 U.S.C. § 552(b)(8)(A)(ii); *see also Sierra Club v. United States Fish & Wildlife Serv.*, 523 F. Supp. 3d 24, 39 (D.D.C. 2021) (ordering agency to release "purely factual information"); *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, No. CV 18-0342 (ABJ), 2021 WL 1209221, at *9 (D.D.C. Mar. 31, 2021) (same).

NHTSA has withheld numerous documents that likely contain factual information. Many of NHTSA's records likely contain facts and figures about the prevalence of distracted driving, studies that show how to mitigate distracted driving, and research about successful interventions that might be made with cellphones or other aftermarket devices. Such information would be *factual* in nature, and segregable, yet NHTSA provides little of it. Likewise, the agency apparently relied on contractors for various "deliverables" and draft deliverables related to driver distraction issues. *See* Humphrey Decl. ¶ 42. But a completed deliverable is a research product, and therefore likely includes large amounts of factual information that must be subject to release. Yet the agency seeks to withhold these deliverables in their entirety.

Not only has the agency failed to disclose these deliverables, but it also has refused to provide presentations, agendas or minutes that contain factual information. The agency fully redacted numerous documents it claims are "Draft meeting agenda[s] regarding internal meeting between NHTSA and contractors concerning driver distraction issues." *See, e.g.*, NHTSA-ES19-004222-000001.[4] But it provides no justification for why factual information in these documents—the time and place of the meetings and the identity of participants, for instance, or agenda items that do not address deliberations over the substance of the Phase 2 Guidelines—must be withheld. *See Prop. of the People, Inc. v. Off. of Mgmt. & Budget,* 330 F. Supp. 3d 373, 381 (D.D.C. 2018).

The agency's attempts to evade disclosure are belied by its own production. For example, NHTSA disclosed an email from one of the agency's contractors sending the "first deliverable"

[4] *See also* NHTSA-ES19-004222-000001; NHTSA-ES19-004222-000003; NHTSA-ES19-004222-000007; NHTSA-ES19-004222-000014; NHTSA-ES19-004222-000017; NHTSA-ES19-004222-000034; NHTSA-ES19-004222-001234; NHTSA-ES19-004222-001730.

ahead of the "biweekly meeting." *See* NHTSA-ES19-004222-001026 (e-mail from Eric Traube to Elizabeth Mazzae and Chris Monk, dated November 6, 2018). The agency has failed to explain why the contents of an e-mail from a contractor describing its work product should be disclosed, but an agenda item addressing that same information would not be.

Similarly, NHTSA, for instance, has sought to shield multiple documents that it labels as "NHTSA cost estimates for potential activities relating to driver distraction." *See, e.g.*, NHTSA-ES19-004222-001169-1172.[5] Just like other data-driven estimates and calculations, cost estimates may be deliberative when they reflect the selections of lower-level employees and require the sort of factual selection and curating reflective of agency decisionmaking. *See, e.g.*, *Quarles v. Dep't of Navy*, 893 F.2d 390, 391 (D.C. Cir. 1990). But here, NHTSA has provided no information to assess which side of the line the cost estimates are on, or how the cost estimates might divulge debate about the substantive content of the Phase 2 Guidelines.

Given these examples, NHTSA has not properly segregated and disclosed factual information contained in the records. *See* 5 U.S.C. § 552(a)(7)(ii)(II); *id.* § 552(b). It must do so.

### B. NHTSA failed to demonstrate that the records are subject to the attorney-client communication or work product privileges.

NHTSA also relies on the attorney-client privilege and the attorney work-product doctrine in addition to the deliberative process privilege. But NHTSA has failed to justify either privilege claim. First, for the attorney-client privilege claims, NHTSA has not provided

---

[5] NHTSA has included similar boilerplate language for the following documents: NHTSA-ES19-004222-001169-1172; NHTSA-ES19-004222-001194; NHTSA-ES19-004222-001489; NHTSA-ES19-004222-001492; NHTSA-ES19-004222-001495; NHTSA-ES19-004222-001498; NHTSA-ES19-004222-001503; NHTSA-ES19-004222-001702-1703.

NHTSA has withheld one cost estimate in its entirety because it claims it is a "draft document provided to counsel in NHTSA Office of Chief Counsel for input regarding cost estimates for potential future activities relating to driver distraction issues." *See* NHTSA-ES19-004222-002834. But agencies cannot shield documents from disclosure by merely sharing them with counsel. *See, e.g., Coastal States Gas Corp*, 617 F.2d at 863.

sufficient information to invoke the privilege. Second, for the work-product claims, NHTSA has failed to show a nexus between the records and actual—rather than speculative—litigation.

### 1. The *Vaughn* Indices and partial disclosures provided by NHTSA are insufficient to justify NHTSA's use of the Attorney-Client Communication Privilege.

NHTSA claims that numerous records it chose not to disclose were properly withheld according to the attorney-client communication privilege.[6] The attorney-client privilege "protects confidential communications from clients to their attorneys made for the purpose of securing legal advice or services." *Tax Analysts v. IRS*, 117 F.3d 607, 618 (D.C. Cir. 1997) (quoting *In re Sealed Case*, 737 F.2d 94, 98–99 (D.C. Cir. 1984)). "In the governmental context, the 'client' may be the agency and the attorney may be the agency lawyer." *Tax Analysts*, 117 F.3d at 618.

To meet its burden, NHTSA must prove, through "detailed and specific information," that the withheld information falls within the attorney–client privilege. *See Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 30 (D.C. Cir. 1998). The agency must establish the specific contexts of withheld information and the attempts made to maintain the confidentiality of the information. *Hayden v. National Sec. Agency*, 608 F.2d 1381, 1387 (D.C.Cir.1979); *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 863 (D.C. Cir. 1980). Communications in which lawyers were cc'd, but did not actively participate, do not warrant the exemption. *Hunton*

[6] Mr. Levin does not challenge NHTSA's decision to withhold documents it describes as involving internal emails between counsel in the NHTSA Office of Chief Counsel about potential strategies or approaches to take in their provision of legal advice to NHTSA's program office. According to NHTSA's *Vaughn* Index, the records that appear to answer this description include: NHTSA-ES19-004222-001265, NHTSA-ES19-004222-001269, NHTSA-ES19-004222-001274, NHTSA-ES19-004222-002197, NHTSA-ES19-004222-003512, and NHTSA-ES19-004222-003572.

*& Williams LLP v. U.S. Env't Prot. Agency*, 248 F. Supp. 3d 220, 253 (D.D.C. 2017). NHTSA has failed to justify its withholdings for three reasons.

First, NHTSA failed to establish that many of its communications with its attorneys were actually "made for the purpose of securing legal advice or services." *Tax Analysts*, 117 F.3d at 618. In *Coastal States Gas Corp.*, 617 F.2d at 854, for instance, the Department of Energy attempted to apply the attorney-client privilege to factual information encountered in the course of audits, rather than private information concerning the agency. The Circuit reasoned that the records "seem to be neutral, objective analyses of agency regulations" and instead "resemble[d], in fact, question and answer guidelines which might be found in an agency manual." *Id.* at 863. The privilege therefore did not apply, *even if* that factual information had been communicated between an agency attorney and other agency staff.

In *Vaughn* Index A, NHTSA attempts to justify its withholding of information described only as "regarding driver distraction issues and future activities," or "discussing potential approaches and considerations for future briefings of DOT leadership regarding a variety of NHTSA activities and initiatives." *See, e.g., Vaughn Index* A at 6-7 (describing NHTSA-ES19-004222-001349, NHTSA-ES19-004222-001371, and NHTSA-ES19-004222-001822). NHTSA also seeks to withhold communications with counsel which, rather than being legal in nature, are "regarding cost estimates for potential future activities relating to driver distraction issues." *See* NHTSA-ES19-004222-002834; NHTSA-ES19-004222-002837. NHTSA's filings do not describe the records in enough detail to demonstrate that they reflect the agency seeking or receiving legal advice from counsel. NHTSA therefore has not met its burden.

Second, NHTSA has not established the context of the communications at issue. *See Campbell,* 164 F.3d at 30. NHTSA's *Vaughn* Index and partial disclosures do not contain the

requisite amount of specificity to establish that NHTSA's lawyers actively participated in all of the communications NHTSA seeks to withhold. For example, NHTSA asserts that NHTSA-ES19-004222-002834 is privileged. But *Vaughn* Index A merely says those records were "provided to counsel in NHTSA Office of Chief Counsel for input regarding cost estimates for potential future activities relating to driver distraction issues." *See Vaughn* Index A at 2, 9. The Index does not indicate whether the record actually contains any comments by NHTSA's counsel, and if it does, how correspondence regarding cost estimates concerns a legal matter. *Id.* Likewise, the description of NHTSA-ES19-004222-000157–160 states that the record reflects "input of various NHTSA divisions, including the Office of Chief Counsel," but does not necessarily indicate the nature of the input from the Office of Chief Counsel or whether it involved legal advice.

Third, the efforts taken to maintain confidentiality also bear on whether documents can be withheld from the public, and NHTSA has failed to establish that it attempted to limit disclosure prior to Mr. Levin's request. As the D.C. Circuit noted in *Coastal States*, the government must demonstrate that, for communications to be afforded the attorney-client privilege, confidentiality was expected in the handling of those communications "both at the time of the communication and maintained since." 617 F.2d at 863. Conversely, in *Pub. Emps. for Env't Resp. v. U.S. Env't Prot. Agency*, 211 F. Supp. 3d 227, 233 (D.D.C. 2016), a court in this District found that the attorney-client privilege was justified where the agency "tagged the relevant records with 'restricted' and 'official use only' labels, and has stored them in a database accessible only to authorized [agency] employees." NHTSA has not described the efforts taken to maintain the confidentiality of the documents requested by Mr. Levin, and accordingly, has not satisfied this test.

### 2. The Vaughn indices and partial disclosures provided by NHTSA are insufficient to justify NHTSA's use of the Attorney Work-Product Communication Privilege.

NHTSA also claims that the Attorney Work-Product privilege justifies its failure to disclose drafts of internal memoranda describing NHTSA Chief Counsel input, drafts of driver distraction guidelines annotated by NHTSA Chief Counsel, and communications with NHTSA Chief Counsel regarding driver distraction issues. In order to establish that it has properly withheld information under the work-product privilege, the agency must: "(1) provide a description of the nature of and contents of the withheld document, (2) identify the document's author or origin, (3) note the circumstances that surround the document's creation, and (4) provide some indication of the type of litigation for which the document's use is at least foreseeable." *Ellis v. U.S. Dep't of Justice*, 110 F.Supp.3d 99, 108 (D.D.C. 2015).

The work-product privilege does not cover "any document prepared by any person in the Government with a law degree simply because litigation might someday occur" or else "the policies of the FOIA would be largely defeated." *Coastal States*, 617 F.2d at 865. The Court must apply a "'because of' test, asking whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *United States v. Deloitte LLP*, 610 F.3d 129, 137 (D.C. Cir. 2010). Materials prepared for reasons other than the prospect of litigation are not protected by the work-product privilege. *See, e.g.*, *Hunton & Williams,* 248 F. Supp. 3d at 252 (finding EPA's preparation of reports to Congress "process were not created 'because of' the possibility of future litigation—unless the Corps would have ignored Congressional inquiries into a less controversial case").

NHTSA has not established the litigation that the withheld documents were prepared in anticipation of. As a general matter, NHTSA guidelines are often "a general statement of policy,

rather than a binding rule" and thus not subject suit under the Administrative Procedure Act. *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 810 (D.C. Cir. 2006). And NHTSA does not provide any documentation for why these particular documents would concern anticipated litigation, either in the *Vaughn* indices or NHTSA's declarations. The General Counsel's office would have responded to requests for input on prospective agency policy, cost estimates, and "driver distraction issues and future activities," regardless of any litigation risk. Without more information, NHTSA has not met its burden to demonstrate Exemption 5 applies.

## II. NHTSA has not met its burden to demonstrate that foreseeable harm would result from release of these records.

Even assuming the documents here fall within Exemption 5, the agency has not demonstrated that it "reasonably foresees that disclosure would harm" the agency's substantive deliberations. 5 U.S.C. § 552(a)(8)(A).

The "foreseeable harm" standard was first enacted as part of the FOIA Improvement Act of 2016. *See FOIA Improvement Act of 2016,* Pub. L. 114-185, 130 Stat. 538 (2016). In drafting the law, the Senate Judiciary Committee noted agency reliance on FOIA's discretionary exemptions was "growing and troubling," resulting in agencies "taking advantage of" the exemptions to withhold "large swaths of Government information, even though no harm would result from disclosure." S. Rep. No. 4, 114th Cong., 1st Sess. 2 (2015) at 3 ("S. Rep. 114-4"). The committee expressed particular concern about the overuse of Exemption 5. *See id.* (noting Exemption 5 had been asserted "more than 79,000 times in 2012—a 41% increase from the previous year").

To address this issue, Congress superimposed an additional requirement on top of FOIA's existing exemptions: Under the new standard, an agency can withhold records "only if" it can demonstrate a specific harm it "reasonably foresees" from release. 5 U.S.C.

§ 552(a)(8)(A). The new standard places a heightened burden on agencies seeking to frustrate FOIA's presumption of openness. Agencies can no longer rely on the same rote invocations of Exemption 5 they have used for decades. *See, e.g.*, *Reps. Comm. for Freedom of the Press*, 3 F.4th at 371 (rejecting assertions of harms in part because the court was "hard pressed to imagine how these assertions differ in any material way from the routine assertions of deliberative process privilege that pre-dated the FOIA Improvement Act"). Instead, agencies must meet two criteria in order to meet their heightened burden.

First, an agency may no longer rely on generic expressions of concern that disclosure may chill internal deliberations. Instead, the agency must state "specific harms" that would "actually ensue from disclosure." *Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 106 (internal quotation marks omitted). "Generalized assertions" are not sufficient. *Machado Amadis v. United States Dep't of State*, 971 F.3d 364, 371 (D.C. Cir. 2020). An agency cannot "rely on mere 'speculative or abstract fears,' or fear of embarrassment" to withhold information. *Reps. Comm. for Freedom of the Press*, 3 F.4th at 369 (*quoting* S. Rep. 114-4 at 8). Nor can the agency merely assert "boilerplate, unparticularized, and hypothesized assertion[s] of harm." *Id.* at 371. To justify withholding records under the deliberative process privilege, an agency "must concretely explain how disclosure 'would'—not 'could'—adversely impair internal deliberations." *Id. at* 369–70.

Second, an agency must assert harm about *specific documents* it seeks to withhold from disclosure. *Reps. Comm. for Freedom of the Press*, 3 F.4th at 371. Agencies may "sometimes satisfy that burden on a category-by-category basis rather than a document-by-document basis—'that is, group together like records' and explain the harm that would result from release of each group." *Id.* (quoting *Rosenberg v. Department of Defense*, 342 F. Supp. 3d 62, 78 (D.D.C.

2018)). But ultimately "the basis and likelihood of that harm must be independently demonstrated for each category." *Id.*

NHTSA has engaged in the exact conduct Congress legislated to prevent when enacting the heightened foreseeable-harm standard. For hundreds of pages of records, NHTSA has not attempted to identify *any* harm it would experience as a result of disclosure. Where the agency does claim harm, it relies on boilerplate invocations of the policy justifications for the deliberative process privilege. NHTSA's attempts to shield its records therefore fall far short of what FOIA now requires an agency to show: particularized harms from the disclosure of *these* records.

### A. NHTSA has not described *any* harm that would result from release of multiple responsive records.

NHTSA's primary allegations of harms come from the Humphrey Declaration.[7] For several tranches of documents, however, that declaration includes no allegations of harm whatsoever.

The agency withholds what it describes as "internal communications between agency personnel pertaining to various draft agency documents relating to the proposed Phase 2 Guidelines."[8] Humphrey Decl. ¶ 40. Ms. Humphrey says these communications include, among

[7] The Fish Declaration asserts general harms which merely restate the policy underpinnings of the deliberative process privilege. *See* Fish Decl. ¶¶ 20-22. As addressed more fully below, generic, boilerplate assertions of harm mimicking the policy justifications for the privilege do not satisfy the agency's heightened burden. *See, e.g.*, *Reps. Comm. for Freedom of the Press*, 3 F.4th at 370. NHTSA's two *Vaughn* Indices merely describe the records the agency seeks to withhold in cursory fashion, and then state what exemption the agency claims apply to those documents. The indices do not address harm.

[8] This category apparently includes the following documents: NHTSA-ES19-004222-79, 80-85, 99-102, 108-09, 124-25, 126-34, 138-39, 145-52, 207, 208-41, 245-46, 283-90, 379, 380-83, 399, 400-504, 505, 506-620, 623-53, 664-65, 666, 667-69, 672, 685, 686-92, 696-97, 699-869, 871-73, 885-94, 895, 897, 898, 899-900, 902-04, 908-09, 910-12, 946-50, 981, 989, 990-94, 995, 1000-07, 1008, 1011-24, 1043-50, 1081, 1108-09, 1152-53, 1156-58, 1163-64, 1165, 1168,

other things, "discussions about status updates and remaining steps for ongoing agency activities," "discussions of feedback and summaries of ongoing work," and "cost estimates for work under consideration." *Id.* In other words, the agency describes why it believes the documents are deliberative in nature, and that it is helpful when agency employees have "the freedom and flexibility to write, rewrite, and seek input on documents in order to refine those materials into versions suitable for providing recommendations to leadership or accurately and effectively conveying information to the public." *Id.* But at no point does the agency assert any *harm* that would foreseeably follow from disclosing the majority of *these* particular records.

Similarly, NHTSA makes no argument that harm would result from release of the records it withholds under the attorney client communications privilege. *See* Humphrey Decl. ¶¶ 47-49.[9] Again, in justifying its withholding, the agency has only offered reasons why the records might

1169-72, 1183-90, 1217-18, 1220-21, 1228, 1275-76, 1374-75, 1376, 1428-29, 1430-33, 1440-41, 1484, 1485-86, 1487-1502, 1503, 1582, 1583-89, 1597, 1609, 1612, 1666-68, 1671, 1681-82, 1683, 1696, 1701, 1702-03, 1836-40, 1848, 1891-92, 1931-46, 1953, 1955, 2104-05, 2141, 2145, 2154, 2155-88, 2213-14, 2215, 2842-48, 2851-53, 2857, 3037-48, 3180-91, 3192-95, 3205, 3206-39, 3240, 3241-43, 3460, 3536-69, 3641, 3642-49, 3653, 3654-56, 3661, 3666, 3667-702, 3796, 3833-37, 3838-49, 3785-95. *See* Humphrey Decl. ¶ 40 n.4.

[9] This category includes the following documents:

- "NHTSA-ES19-004222-000103, 143, 155, 157-60, 295, 297-301, 302, 384, 385-86, 395-96, 670-71, 681-82, 906-07, 984, 1062-80, 1093, 1166, 1167, 1177-78, 1191-97, 1219, 1222, 1223-27, 1262-73, 1330-31, 1346-48, 1349, 1372-73, 1378-79, 1380-85, 1389-90, 1391-92, 1413-14, 1450-51, 1466-67, 1535-36, 1550-51, 1625-65, 1666-68, 1673-80, 1685-90, 1821-25, 1831, 1834-35, 1850-51, 1852-55, 1856-59, 1861-62, 1885-86, 1888, 1888-99, 1890, 1893-94, 1896, 1921, 1930, 1986, 1987, 2103, 2104-05, 2135, 2142, 2189-90, 2191, 2192, 2193-96, 2198- 200, 2216, 2833, 2834, 2835-36, 2854-55, 3178-79, 3199-200, 3446, 3450-51, 3492-93, 3496-98, 3508-11, 3570-71, 3664-65, 3666, 3757." Humphrey Decl. ¶ 47 n.8.
- "NHTSA-ES19-004222-000942-43, 1034, 1059-60, 1326, 1436-39, 1590-93, 1829, 1842, 1846-47, 1897, 1956, 1957, 2201, 3280, 3721-23, 3732." *Id.* ¶ 47 n.9.
- "NHTSA-ES19-004222-000112-19, 157-60, 303-58, 385-86, 906-07, 1265, 1269, 1274, 1371, 2106-29, 2197, 2837, 3451-55, 3512, 3572, 3798-831." *Id.* ¶ 47 n.10.

be within the scope of Exemption 5. It has not offered any reason why foreseeable harm would result from the records' release.

FOIA now mandates that an agency may withhold records under Exemption 5 "*only if*" it can establish it would be harmed. 5 U.S.C. § 552(a)(8). The agency has offered no harm for the documents described in paragraphs 40 and 47 through 49 of the Humphrey Declaration, and therefore failed to meet its burden. This Court should order NHTSA to immediately release those documents.

### B. NHTSA's boilerplate invocations of the policy considerations underpinning the deliberative process privilege do not establish foreseeable harm.

NHTSA has also failed to meet its burden even where it has attempted to assert foreseeable harm. The agency has done little more than restate the reasons Exemption 5's deliberative process privilege exists in the first place, with little reference to the records it currently withholds. Congress enacted the foreseeable harm standard to counteract such rote agency invocations of the privilege.

#### 1. The agency relies on boilerplate language.

As to its general assertions of harm, NHTSA has repeated the errors identified by the D.C. Circuit in *Reporters' Committee for Freedom of the Press,* 3 F.4th at 370. Like NHTSA, the DOJ and FBI sought to shield, among other things, e-mails between FBI personnel and their supervisors discussing drafts. The declarations the DOJ and FBI submitted in *Reporters' Committee* mirrored the broad statements NHTSA submitted in this case, as becomes clear when both are placed side-by-side:

| DOJ/FBI | NHTSA |
|---|---|
| "Indeed, that declaration contains a sweeping assertion that 'requir[ing] disclosure of the withheld information would prevent the [Office of the Inspector General] from *engaging in meaningful documented discussion about policy matters in the future*, which could have a negative effect on agency decision-making, and would potentially confuse the public about the reasons for the [Office of the Inspector General]'s actions in this matter." *Reporters' Committee for Freedom of the Press,* 3 F.4th at 371 (emphasis added) | "Based on my experiences throughout the course of my work at NHTSA, disclosure of materials reflecting this process would harm the agency and, specifically, would harm collaborative work by *chilling deliberative dialogue* . . . ." Fish Decl. ¶ 20 |
| "*FBI employees would hesitate to offer their candid and conscientious opinions to superiors or coworkers if they knew their opinions of the moment might be made a matter of public record at some future date*, and because such self-censorship would, in turn, degrade the quality of agency decisions by depriving the decisionmakers of fully-explored options developed from robust debate." *Reporters' Committee for Freedom of the Press,* 3 F.4th at 371 (emphasis added). | "When such communications become subject to public release, it may constrain the candidness of the input, make many individuals reluctant to provide as frequent or informal of daily status updates, and result in a negative impact on the overall work product." Fish Decl. ¶ 22. |
| "Release of this draft report would be harmful as the draft would also reveal the thought and decision-making processes of the [Office of the Inspector General] and may not reflect the agency's final decisions." *Reporters' Committee for Freedom of the Press,* 3 F.4th at 371 | "The public disclosure of such deliberative information would also likely confuse the public, as these communications may include preliminary views, recommendations, or impressions that have not been fully evaluated, let alone adopted as a final agency position." Fish Decl. ¶ 21 |

The D.C. Circuit rejected these assertions as "precisely the kind of boilerplate, unparticularized, and hypothesized assertion of harm" no longer acceptable in light of the foreseeable harm requirement. *Reps. Comm. for Freedom of the Press,* 3 F.4th at 371. This Court should do the same here.

### 2. The agency fails to allege specific harms relating to specific groups of documents.

The agency also has not properly connected its purported harms to specific groups of documents. NHTSA must at least, "group together like records and explain the harm that would result from release of each group." *Id* at 369 (internal quotation marks omitted). Instead of grouping like documents together here—multiple agendas, for instance, or certain types of deliverables from agency contractors, NHTSA chooses to adopt six sweeping categories that have little internal logic.

For instance, one of these categories is "[m]aterials emblematic of the routine, ongoing communications among agency personnel." Def. MSJ at 15; Humphrey Decl. ¶ 41. The category is so broad as to contain "communications with other Department of Transportation personnel . . . or contractors," "draft agendas for internal meetings," "documents and work product," and "deliverables or draft deliverables." Humphrey Decl. ¶ 42. The agency offers no explanation for why draft agendas would result in the same harm as "deliverables" or communications between its parent agency. It then randomly picks three records—apparently all presentations—to highlight what it claims are harms applicable to the category as a whole. Humphrey Decl. ¶ 43. It does not attempt to explain why the three presentations make sense to group together with draft agendas, for instance, or with deliverables or communications. Nor does it suggest that the substantive content of the records cuts across their multiple forms: there is no suggestion, for instance, that a particular policy proposal is being debated across an e-mail chain, in an agenda item or in meetings, thus requiring redaction across those three documents.

As a result, the agency has failed to properly demonstrate harm with respect to specific documents or, at most, like-groupings of documents.

### 3. Where NHTSA does describe specific harms, it fails to connect those harms to the withheld records.

NHTSA attempts to meet its burden by singling out a small subset of records in its declarations, and claiming specific harms only with respect to those records. *See, e.g.*, Humphrey Decl. ¶ 37 (claiming harm only as to NHTSA-ES19-004222-01332-42); *id.* ¶ 38 (claiming harm only as to NHTSA-ES19-004222-001590-93); *id.* ¶ 39 (claiming harm only as to NHTSA-ES19-004222-003703). As addressed above, NHTSA has failed to demonstrate that each of the sample records are exemplary of the broader group NHTSA claims the record represents, and therefore the vast majority of records NHTSA has not provided any reason to believe disclosure of the vast majority of withheld records cause harm at all. But even where it does address specific harms related to specific documents, NHTSA fails to articulate harms that would justify withholding even those records.

First, even when NHTSA asserts harm related to specific records, the alleged harm is often so generic that one could substitute in almost any deliberative document, regardless of form or content, and allege the same harm. For instance, NHTSA redacted most of NHTSA-ES19-004222-001332-42, which it describes as "involv[ing] a communication from an outside entity to NHTSA Public Affairs, requesting a quote from NHTSA about how adding payment systems and voice assistants to vehicles may impact driver attention and safety." Humphrey Decl. ¶ 37. Releasing the unredacted record, according to the agency, would "reveal the agency's internal process for handling inquiries that regard an agency project," and thereby threaten NHTSA's candor and "harm transparency." *Id.*

The harm the agency alleges is implausible. There is no explanation for why releasing a now-years-old media request, which does not even mention Phase 2, might somehow harm the agency's substantive deliberations on the guidelines. *See, e.g.*, *Ctr. for Investigative Reporting*,

436 F. Supp. 3d 90 at 107 (suggesting the court could not readily see harm where agency's individual bid process had finished, even though broader agency project had not). And NHTSA claims that complying with its transparency obligations under FOIA would somehow harm transparency, although it does not explain its logic. Humphrey Decl. ¶ 37.

More fundamentally, the generic descriptions of harm NHTSA offers might apply to any Exemption 5 materials and, if this Court deems them sufficient, the foreseeable harm requirement becomes circular. It would allow an agency to establish foreseeable harm simply by showing that a record falls within the scope of Exemption 5. Such a result would be flatly inconsistent with the text of 5 U.S.C. § 552(a)(8) and contrary to Congress's evident intent to rein in agencies' overbroad assertions of the deliberative process privilege.

Second, NHTSA rarely demonstrates a nexus between the record discussed and the harm the agency claims prevents its release. For instance, NHTSA claims that ES19-00422-003703 contains information "about the *status of the agency's review* of comments it received on the proposed Phase 2 guidelines." Humphrey Decl. ¶ 39 (emphasis added); *see also Vaughn* Index at 44 (describing NHTSA-ES19-00422-003703 as "[i]nteral DOT emails discussing status of Agency review of comments relating to Phase 2 Distraction Guidelines and projections related to future work regarding same"). The descriptions suggest that NHTSA is shielding mere updates about the progress the substantive review was making.

The putative harm NHTSA claims, however, only addresses what would happen if the substantive deliberations—not the status of those deliberations—were released. *See* Humphrey Decl. ¶ 39. NHTSA claims that the "[i]nternal evaluation of comments . . . is a core component of deliberations." The harms it claims relate to releasing "interim impressions and reactions to comments," which would "reveal only the preliminary views of that individual or small group, at

whatever time the document was prepared." *Id.* Releasing those preliminary views would harm agency decisionmaking, it claims, because it would lead to public confusion about the agency's views. *Id.* But NHTSA has not claimed that ES19-00422-003703 offers a summary of the *substantive* preliminary views, but merely that it is a record that documents the current timeline by which that substantive review will take place. To the extent that NHTSA's proffered harm might be persuasive, then it does little show harm from disclosure of a document that, by NHTSA's own account, only addresses the status of the review rather than its substance.

Finally, as addressed above, NHTSA does not appear to actively be working on the Phase 2 Guidelines. Nowhere in their filings does the agency account for how it would be harmed *now*, given that many of these documents are years old and likely prepared, at most, for deliberative processes long culminated or stale.

Given these considerations, the agency has not demonstrated sufficient harm to justify withholding responsive records. Mr. Levin is entitled to summary judgment, and the Court should order NHTSA to release the documents at issue here.

## III. NHTSA did not provide an adequate justification for failing to disclose segregable information.

NHTSA fails to demonstrate it has properly disclosed all segregable non-exempt portions of the records at issue in this case. FOIA requires agencies to disclose any "reasonably segregable portion of a record" once the exempt portions are redacted. 5 U.S.C. § 522(b); *see also Rosenberg*, 442 F. Supp. 3d at 254 (placing the burden on the government to segregate and disclose non-exempt information). While NHTSA is entitled to a presumption that it complied with the requirement to disclose all reasonably segregable documents, "this presumption of compliance does not obviate the agency's obligation to carry its evidentiary burden and fully explain its decisions on segregability." *Sierra Club*, 523 F.Supp.3d at 38-39. To meet this

burden, NHTSA must provide detailed justifications demonstrating with "reasonable specificity" why documents withheld under a valid exemption cannot be further segregated. *Id* at 38. In *Sierra Club*, for instance, the court held the agency failed to provide detailed justifications because the agency merely gave a "conclusory assertion that it [had] 'carefully reviewed the responsive records on a line-by-line and page-by-page basis'" to demonstrate that all reasonably segregable information had been released. *Id*. at 39.

NHTSA provides similar conclusory statements here. NHTSA merely asserts that it conducted a "line-by-line review of the documents and determined that there is no additional meaningful, non-exempt information that can be reasonably segregated and released." Humphrey Decl. ¶ 50. It then claims that any further description of the withheld information could identify actual exempt information. *Id*.; *but see Wilderness Soc'y v. Dep't of Interior*, 344 F. Supp. 2d 1, 19 (D.D.C. 2004) ("[A] blanket declaration that all facts are so intertwined to prevent disclosure under the FOIA does not constitute a sufficient explanation of non-segregability."). NHTSA's single paragraph addressing segregability fails to provide a detailed justification, with reasonable specificity, why the withheld documents cannot be further segregated to release non-exempt information. NHTSA has not met its burden to justify withholding non-exempt information.

## CONCLUSION

This Court should deny Defendant's Motion for Summary Judgment, ECF No. 20, grant Plaintiff's Motion for Summary Judgment and order Defendants to release all records responsive to Mr. Levin's FOIA request.

**Dated:** November 19, 2021

/s/ John H. Giammatteo

John Harland Giammatteo (Bar ID NY0438)*
Stephanie K. Glaberson (Bar ID 177092)
David C. Vladeck (Bar ID 945063)
Georgetown University Law Center
Civil Litigation Clinic
600 New Jersey Avenue, NW, Room 312
Washington, D.C. 20001
(202) 662-9545
John.Giammatteo@georgetown.edu

* Counsel wish to acknowledge the assistance of Georgetown University Law Center students Andrene Loiten and Ibad H. Jafri in the preparation of this memorandum.