UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MYRON LEVIN, | |
| *Plaintiff,* | |
| v. | Civil Action No. 20-3236 (JMC) |
| NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION, | |
| *Defendant.* | |

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S <u>MOTION FOR SUMMARY JUDGMENT</u>**

MATTHEW M. GRAVES, D.C. Bar No. 481052
United States Attorney

BRIAN P. HUDAK
Acting Chief, Civil Division

DOUGLAS C. DREIER, D.C. Bar No. 1020234
Assistant United States Attorney
Civil Division
U.S. Attorney's Office for the District of Columbia
555 4th Street, N.W.
Washington, D.C.  20530
(202) 252-2551
douglas.dreier@usdoj.gov

*Counsel for Defendant*

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

ARGUMENT............................................................................................................... 2

I.    Defendant's Justification of its Deliberative Process Claims Is Logical and Plausible. ..... 3

    A.    Defendant Has Identified the Deliberative Process Involved...................................... 3

    B.    Defendant Has Demonstrated the Role the Withheld or Redacted Records Played in the Deliberative Process...................................................................................... 12

    C.    Defendant Has Provided Information about the Decisionmaking Authority of the Individuals Included in the Records. ...................................................................... 15

    D.    Defendant Has Disclosed Factual Information............................................................. 18

    E.    Defendant Has Demonstrated Foreseeable Harm......................................................... 21

II.    Defendant's Justification of its Attorney-Client Privilege Claims Is Logical and Plausible.......................................................................................................................... 25

    A.    Defendant Has Maintained Confidentiality.................................................................. 25

    B.    These Records Were Communicated to or by an Attorney to Provide NHTSA with Legal Advice. ............................................................................................................. 26

    C.    Defendant Has Identified the Foreseeable Harm That Would Ensue If the Records Were Disclosed. ......................................................................................................... 29

III.    Defendant's Justification of its Attorney Work Product Claims Is Logical and Plausible.......................................................................................................................... 30

IV.    Defendant Has Released All Reasonably Segregable Information............................... 32

CONCLUSION.............................................................................................................. 34

i

## TABLE OF AUTHORITIES

**Cases**

*100Reporters LLC v. Dep't of Just.*,
   248 F. Supp. 3d 115 (D.D.C. 2017) .................................................................. 4

*Access Reports v. Dep't of Just.*,
   926 F.2d 1192 (D.C. Cir. 1991) ......................................................................16, 18

*Ancient Coin Collectors Guild v. Dep't of State*,
   641 F.3d 504 (D.C. Cir. 2011) ...................................................................... 18, 19

*Armstrong v. Exec. Off. of the President*,
   97 F.3d 575 (D.C. Cir. 1996) .......................................................................... 32

*Bartholomew v. Avalon Capital Grp., Inc.*,
   278 F.R.D. 441 (D. Minn. 2011) ...................................................................... 28

*Campbell v. Dep't of Just.*,
   164 F.3d 20 (D.C. Cir. 1998) .......................................................................... 25

*Carlborg v. Dep't of Navy*,
   Civ. A. No. 18-1881 (DLF), 2020 WL 4583270 (D.D.C. Aug. 10, 2020) ......................... 6, 18

*Coastal States Gas Corp. v. Dep't of Energy*,
   617 F.2d 854 (D.C. Cir. 1980) ........................................................................ 29

*Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*,
   452 F.3d 798 (D.C. Cir. 2006) ........................................................................ 32

*Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*,
   436 F. Supp. 3d 90 (D.D.C. 2019) ..................................................................... 4

*Ecological Rights Found. v. EPA*,
   Civ. A. No. 190980 (BAH), 2021 WL 535725 (D.D.C. Feb. 13, 2021) .............................. 29

*Fish & Wildlife Serv. v. Sierra Club, Inc.*,
   141 S. Ct. 777 (2021) .................................................................................7

*Hayden v. Nat'l Sec. Agency*,
   608 F.2d 1381 (D.C. Cir. 1979) ....................................................................... 25

*Hickman v. Taylor*,
   329 U.S. 495 (1947) ................................................................................... 30

*Hunton & Williams LLP v. EPA,*
  248 F. Supp. 3d 220 (D.D.C. 2017) ................................................................. 25, 26

*In re Sealed Case,*
  146 F.3d 881 (D.C. Cir. 1998) ........................................................................... 31

*Johnson v. Exec. Off. for U.S. Att'ys,*
  310 F.3d 771 (D.C. Cir. 2002) ...................................................................... 33, 34

*Jud. Watch, Inc. v. FDA,*
  449 F.3d 141 (D.C. Cir. 2006) ............................................................................. 1

*Judge Rotenberg Educ. Ctr., Inc. v. FDA,*
  376 F. Supp. 3d 47 (D.D.C. 2019) ....................................................................... 4

*Larson v. Dep't of State,*
  565 F.3d 857 (D.C. Cir. 2009) ............................................................................. 2

*Mapother v. Dep't of Just.,*
  3 F.3d 1533 (D.C. Cir. 1993) ............................................................................. 19

*Mead Data Cent., Inc. v. Dep't of Air Force,*
  566 F.2d 242 (D.C. Cir. 1977) ...................................................................... 25, 29

*Miller v. Casey,*
  730 F.2d 773 (D.C. Cir. 1984) ............................................................................. 2

*Mullen v. Bureau of Prisons,*
  843 F. Supp. 2d 112 (D.D.C. 2012) ..................................................................... 3

*Quarles v. Department of Navy,*
  893 F.2d 390 (D.C. Cir. 1990) ...................................................................... 20, 21

\* *Reps. Comm. for Freedom of the Press v. FBI,*
  3 F.4th 350 (D.C. Cir. 2021) ........................................... 1, 3, 7, 18, 19, 21

*Rosenblatt v. Fenty,*
  734 F. Supp. 2d 21 (D.D.C. 2010) ....................................................................... 4

*SafeCard Servs., Inc. v. SEC,*
  926 F.2d 1197 (D.C. Cir. 1991) ...................................................................... 6, 18

*Selgjekaj v. Exec. Off. for U.S. Att'ys,*
  Civ. A. No. 20-2145 (CRC), 2021 WL 3472437 (D.D.C. Aug. 6, 2021) ............... 29

*Sierra Club v. Fish & Wildlife Service,*
    523 F. Supp. 3d 24 (D.D.C. 2021) ...................................................................................... 33

*Tax Analysts v. IRS,*
    117 F.3d 607 (D.C. Cir. 1997) .......................................................................................... 30

*Wolf v. CIA,*
    473 F.3d 370 (D.C. Cir. 2007) ............................................................................................ 2

**Other**

Visual-Manual NHTSA Driver Distraction Guidelines for Portable and Aftermarket Devices,
    81 Fed. Reg. 87,656, 87,659 (Dec. 5, 2016) ........................................................................ 32

## INTRODUCTION

In his opening brief (ECF No. 23), Plaintiff Myron Levin appears to take issue with almost the entire scope of the production, spanning hundreds of Exemption 5 withholdings made by Defendant National Highway Traffic Safety Administration ("NHTSA").  This approach continues Plaintiff's lack of significant conferral throughout the litigation.   Since Plaintiff has broadly challenged almost all the redactions across the nearly 4,000-page production, the breadth of Plaintiff's challenge compelled NHTSA to utilize a category-based description of the records, an approach that complies with the Court's page limits (*see* LCvR 7(e)) and that the D.C. Circuit has endorsed for cases like this one.  *See Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 368 (D.C. Cir. 2021) ("Such 'categorization and repetition provide efficient vehicles' for reviewing an agency's withholding decisions when they 'implicate the same exemption for similar reasons.'") (quoting *Jud. Watch, Inc. v. FDA*, 449 F.3d 141, 147 (D.C. Cir. 2006)).

While Defendant rejects any suggestion as to the purported impropriety of Defendant's categorizations in its opening brief—which is an approach blessed by the D.C. Circuit for good reason—Defendant now provides an updated *Vaughn* index and supplemental declaration.  In conferrals throughout this litigation, Plaintiff continually pointed to almost all the redactions, rather than identify specific issues or documents underlying his concerns with the production. NHTSA repeatedly attempted to confer in further detail and provide more information to explain the redactions, even voluntarily providing a *Vaughn* index prior to briefing in hopes of jumpstarting these conversations.

Having now reviewed Plaintiff's opening brief, NHTSA includes with this Reply an updated *Vaughn* index and supplemental declaration, which demonstrate—for a representative sample of deliberative process claims (*i.e.,* those that Plaintiff has specifically called out in his

1

opening brief), as well as every attorney-client privilege and attorney work product withholding or redaction that NHTSA has made—that Defendant adequately and accurately substantiated its Exemption 5 claims.[1]  They provide further support for the categorization used in Defendant's opening brief and further demonstrate that Defendant has met its burden through this categorization.

Based on the thorough record, Defendant respectfully submits that the Court should grant its motion for summary judgment and deny Plaintiff's cross-motion for summary judgment.

## ARGUMENT

Defendant submits that it is entitled to summary judgment because it has "describe[d] [its] justifications for nondisclosure with reasonably specific detail, demonstrate[d] that the information withheld logically falls within the claimed exemption, and [is] not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (quoting *Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir. 1984)).  As the D.C. Circuit has explained, "an agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible." *Id.* (quoting *Wolf v. CIA*, 473 F.3d 370, 374–75 (D.C. Cir. 2007)) (internal quotation marks omitted).  Plaintiff has not demonstrated and cannot demonstrate anything illogical or implausible in Defendant's justification of its Exemption 5 claims.  Below, Defendant addresses its deliberative process claims, attorney-client privilege claims, and attorney work product claims *seriatim*, before concluding with segregability.

---

[1]     Records withheld under the attorney-client privilege or attorney work product doctrines were also withheld under the deliberative process privilege.  Accordingly, Defendant's representative sampling of its deliberative process withholdings in its Supplemental *Vaughn* Index includes a significant percentage of all its deliberative process withholdings. *See generally* Suppl. *Vaughn* Index.

I.    **Defendant's Justification of its Deliberative Process Claims Is Logical and Plausible.**

In 2021, the D.C. Circuit clarified the standard for invoking the deliberative process privilege. *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 361–62 (D.C. Cir. 2021). As explained in *Reporters Committee*, the "deliberative process privilege covers documents reflecting advisory opinions, recommendations, and deliberations that are part of a process by which [g]overnment decisions and policies are formulated." *Id.* at 361 (internal quotation marks omitted). It protects documents that are "both predecisional and deliberative." *Id.* at 362. "A document is predecisional if it was generated before the agency's final decision on the matter." *Id.* (internal quotation marks omitted). "A document is deliberative when it is prepared to help the agency formulate its position[,] and it reflects the give-and-take of the consultative process." *Id.* (internal quotation marks and citations omitted).

Plaintiff contends that Defendant has: (1) not identified the deliberative process involved; (2) not demonstrated the role the withheld records played in the decisional process; (3) not provided information about the decisionmaking authority of the individuals issuing the documents; (4) "likely" not disclosed factual information; and (5) not adequately demonstrated foreseeable harm. Pl.'s Resp. at 10–19, 24–33. Each argument fails.

A.    **Defendant Has Identified the Deliberative Process Involved.**

Defendant identified the deliberative process at issue for each of the withheld or redacted documents by sorting them into six categories. *See* Def.'s Br. at 13–16. In Plaintiff's response, Plaintiff has not objected to redactions based on the sixth category, which addressed redactions of internal system locations where deliberative materials were stored or dedicated email server addresses to which such materials were submitted; therefore, Plaintiff has waived any objection to those redactions. *See Mullen v. Bureau of Prisons*, 843 F. Supp. 2d 112, 115 (D.D.C. 2012) (Jackson, J.) ("[A]n argument in a dispositive motion that the opponent fails to address in an

3

opposition may be deemed conceded.") (quoting *Rosenblatt v. Fenty*, 734 F. Supp. 2d 21, 22 (D.D.C. 2010)).  As a result, Defendant addresses only the first five categories in this reply.

In its opening brief, Defendant divided its redactions and withholdings into several categories: (1) "[i]nternal communications between agency personnel regarding outside inquiries or public statements relating to the proposed Phase 2 Guidelines"; (2) "[i]nternal communications between agency personnel regarding briefings (including apprising agency leadership) on issues relating to the proposed Phase 2 Guidelines"; (3) "[i]nternal communications between agency personnel pertaining to comments received on the proposed Phase 2 Guidelines"; (4) "[i]nternal communications between agency personnel pertaining to various draft agency documents relating to the proposed Phase 2 Guidelines"; or (5) "the internal exchange of information, ideas, and recommendations that occurred during the course of NHTSA personnel's work on the day-to-day projects that arose as the agency continued [to] develop the Phase 2 Guidelines."  Def.'s Br. at 13–15.

Plaintiff urges that this categorization fails to identify the particular "subsidiary processes" at issue in the records.  Pl.'s Resp. at 11.  As Plaintiff's own authorities recognize, an agency "is not required to link each document to a specific action."  *100Reporters LLC v. Dep't of Just.*, 248 F. Supp. 3d 115, 153 (D.D.C. 2017) (Contreras, J.).  Of course, if an agency's "*Vaughn* Index create[s] the impression that the documents at issue might themselves be final subsidiary agency decisions," then Plaintiff is correct that the agency must identify the subsidiary agency decision. *Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90, 102 (D.D.C. 2019) (Howell, C.J.); *see also Judge Rotenberg Educ. Ctr., Inc. v. FDA*, 376 F. Supp. 3d 47, 67 (D.D.C. 2019) (Howell, C.J.) (finding *Vaughn* index inadequate where "plaintiff supplied several possible subsidiary decisions to which the withheld records may relate").  That is not the case here.

As NHTSA's Hannah Fish avers:

> the process undertaken for the Proposed Guidelines involved the agency deliberating internally about the content and scope of the Guidelines before culminating that deliberation into a publication of proposed guidelines in the Federal Register. As described in the published proposal, the purpose of taking such an approach was to encourage public comment on the Proposed Guidelines in order to assess how such input may factor into the agency's considerations about publishing final guidelines. *As such, this type of process does not typically involve a host of intermediate public steps, but instead typically involves internal deliberation and reflection in which if a final decision is reached, that decision culminates in a publication of the agency's final position.*

Suppl. Fish Decl. ¶ 7 (attached) (emphasis added). Thus, this is not a case involving subsidiary intermediate decisions, but rather "internal deliberation and reflection in which if a final decision is reached, that decision culminates in a publication of the agency's final position." *Id.*

With respect to whether a final decision has been made, NHTSA has been clear: "no final decisions on the proposed Phase 2 Guidelines have been made, and . . . the development of the Guidelines has been, and remains, in a predecisional, deliberative state." *Id.* ¶ 5. Indeed, NHTSA "remains in the deliberative stages with respect to next steps or approaches for the Phase 2 Guidelines and, as such, no decisions from these individuals or the agency have been reached on specific future approaches." *Id.* ¶ 6. Thus, "the issue remains under consideration by the agency and neither the staff nor the leadership have finalized recommendations, approaches, or directions for future course(s) of action, which here remain pending and open to further discussions within the agency." *Id.* Notably, NHTSA is unaware of any "interim conclusions reached by the agency about intermediate initiatives or positions to announce with respect to the Phase 2 Guidelines," which is unsurprising given that "future options and approaches remain open questions within the agency." *Id.* ¶ 7.

In the face of sworn testimony to the contrary, Plaintiff urges that deliberations regarding the proposed Phase 2 Guidelines are not ongoing merely because one of Defendant's *Vaughn*

5

indices does not include more documents that post-date May 2019.  Pl.'s Br. at 14.  Plaintiff's

FOIA request was submitted December 12, 2019, so Plaintiff's comment is directed at a period of

only approximately six months.  *See* Humphrey Decl. (ECF No. 20-5) ¶ 21.

The mere fact that Defendant did not withhold more documents after May 2019 does not

justify disbelieving the sworn affidavits Defendant has submitted averring that the Phase 2

Guidelines "remained in an internal and pending status for the entirety of the time period requested

by Plaintiff."  *Id.* ¶ 33; *see also* Fish Decl. (ECF No. 20-3) ¶ 16 ("The Office of Vehicle Safety

Research continues to discuss and refine potential next steps and options moving forward for the

proposed Phase 2 Guidelines."); *id.* ¶ 18 ("In sum, . . . the development of these Guidelines has

been, and remains, in a predecisional, deliberative state.").  While the "level and nature of

discussions about the Guidelines may vary in frequency and substance during any given period of

time," "NHTSA's Office of Vehicle Safety Research continues to discuss and refine potential next

steps and options for moving forward with the proposed Phase 2 Guidelines."  Suppl. Fish Decl.

¶ 5.

The Court should reject Plaintiff's mere speculation to the contrary.  *See Carlborg v. Dep't*

*of Navy*, Civ. A. No. 18-1881 (DLF), 2020 WL 4583270, at \*6 (D.D.C. Aug. 10, 2020) ("[T]he

record contains no evidence to support these claims, and the [agency] is afforded 'a presumption

of good faith, which cannot be rebutted by purely speculative claims.'") (quoting *SafeCard Servs.,*

*Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991)).  The proposed Phase 2 Guidelines remain in a

predecisional and deliberative state, and NHTSA is unaware of any "interim conclusions reached

by the agency about intermediate initiatives or positions to announce with respect to the Phase 2

Guidelines."  Suppl. Fish Decl. ¶ 7.  Given that this is not a case involving subsidiary decisions

which themselves are segregable for disclosure, Defendant logically cannot be required to identify

such decisions and doing so here would require the disclosure of the ongoing deliberations at the agency.[2]

Defendant describes below the six documents that Plaintiff discusses in this section of his opening brief and demonstrates how each document is predecisional and deliberative.  Defendant takes this representative sample of documents from its *Vaughn* indices—a sample chosen by Plaintiff, not Defendant—and uses its Supplemental *Vaughn* Index to demonstrate the accuracy of Defendant's initial descriptions.  *See Reps. Comm.*, 3 F.4th at 368 ("To the extent that [plaintiffs] suggest that the district court erred in relying on a representative sample . . . of the documents at issue, they are mistaken. . . . Courts, in fact, routinely review sample documents to determine whether exemptions have been appropriately claimed.").  In each case, these documents are predecisional and deliberative because they were generated "before the agency's final decision on the matter" and were "prepared to help the agency formulate its position," "reflect[ing] the give-and-take of the consultative process." *Id.* at 362.

First, Plaintiff highlights NHTSA-ES19-004222-001332-42.  Pl.'s Br. at 12.  As Defendant described initially, this is an "[i]nternal NHTSA communication regarding potential responses and draft language relating to external media inquiry, which is included in this email chain in an unredacted form." *Vaughn* Index for Redactions (ECF No. 20-8) at 20.  More specifically, this is an email chain between NHTSA's Research Division and NHTSA's Office of Communications and Consumer Information to discuss how to respond to the external media question that appears unredacted on NHTSA-ES19-004222-001333-34 (asking about the safety impact of voice

---

[2]     Moreover, even assuming Plaintiff's speculative premise, a matter remains deliberative even if no longer actively pursued by the agency. *See Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 788 (2021) (holding that recommendations remained deliberative even though they were never finalized, while stressing that "[t]he recommendations were not last because they were final; they were last because they died on the vine").

assistants and other interactive vehicle dashboard features).    Suppl. *Vaughn* Index at 13. Specifically, the redacted email that appears on NHTSA-ES19-004222-001333 is from Derrell Lyles, a NHTSA public affairs employee, who forwards the media question to Chris Monk, the Chief of the Human Factors/Engineering Integration Division at NHTSA, and Nat Beuse, NHTSA's Associate Administrator for Vehicle Safety Research. *Id.* In turn, Mr. Beuse forwards the email to other staff engineers in his Division, asking Mr. Lyles to work specifically with Cem Hatipoglu, Director of NHTSA's Office of Vehicle Crash Avoidance and Electronic Controls Research, on a response. *Id.* The email exchange on the subsequent pages reflects NHTSA personnel's thoughts and discussion about how to approach a response, as well as draft language proposed first by Mr. Lyles and then revised by Mr. Hatipoglu and Mr. Monk in subsequent emails, in an effort to deliberate over the best way to phrase and approach a response. *Id.*

Second, Plaintiff highlights NHTSA-ES19-004222-000014. Pl.'s Br. at 13. As Defendant described initially, this is a "[d]raft meeting agenda regarding internal meeting between NHTSA and contractors concerning driver distraction issues." *Vaughn* Index for Withholdings (ECF No. 20-7) at 2. More specifically, this is a draft meeting agenda provided by the Battelle Center for Human Performance and Safety ("Battelle Center"), which was a contractor for NHTSA that performed Phase 2 Driver Distraction work for the Agency. Suppl. *Vaughn* Index at 1. This agenda is dated May 7, 2019, and it concerns a biweekly meeting coordinating work on conformance testing for the visual-manual driver distraction guidelines. *Id.* The email transmitting this agenda is reflected in NHTSA-ES19-004222-000015, which is an email from Christian Richard (Senior Scientist at the Battelle Center) and sent to both NHTSA personnel in the Human Factors/Engineering Integration Division (including the Chief, Chris Monk), and agency contractors. *Id.* The agenda is in an outline format, which includes sections for updates of ongoing

activities, comments on outstanding deliverables, items for proposed NHTSA discussion, and action items as takeaways from the meeting. *Id.*

Third, Plaintiff highlights NHTSA-ES19-004222-000186. Pl.'s Br. at 13. This page was listed in the Vaughn Index for Withholdings because it was part of a PowerPoint presentation, which begins at NHTSA-ES19-004222-000166, that was listed as an entry on that Index. Suppl. Vaughn Index at 4. However, this particular page was segregated and produced in full. *Id.* As Defendant described initially, this is a "[p]resentation and agenda for NHTSA, created by Agency contracted company, concerning activities regarding driver distraction." *Vaughn* Index for Withholdings at 3. More specifically, the presentation is for an October 2018 meeting between NHTSA and three contractors that conducted work on conformance testing for the proposed Phase 2 Guidelines. Suppl. *Vaughn* Index at 4. This meeting is the kickoff for the contractors' work on the project. *Id.* As such, the slide deck, which was prepared by the lead contractor (*i.e.,* the Battelle Center), is essentially the Battelle Center's overview for NHTSA of the anticipated activity in performance of the contract. *Id.* The presentation describes the objectives of potential work, the specific timeframes for future studies under consideration, ideas for possible tasks and scopes for those driver distraction studies, and considerations for identifying potential test procedures and objectives. *Id.* The last page (000186) is simply a concluding slide that facilitates "questions and discussions." *Id.* As it does not describe any of the deliberative information reflected in the preceding pages of the presentation, NHTSA segregated it from the redactions in the rest of the record and produced it. *Id.* This is consistent with NHTSA's representation in the Humphrey Declaration that "NHTSA conducted a line-by-line review of the documents and determined that there is no additional meaningful, non-exempt information that can be reasonably segregated and released" beyond what NHTSA has already segregated. Humphrey Decl. (ECF No. 20-5) ¶ 50.

9

Fourth, Plaintiff highlights NHTSA-ES19-004222-000248–82.[3]    Pl.'s Br. at 13.   As Defendant described initially, this is an "[a]nnotated copy of [a] NHTSA presentation summarizing driver distraction fleet issues.   The copy contains comments and notes from internal NHTSA personnel regarding content and impressions."   *Vaughn* Index for Withholdings at 3.   More specifically, this is an annotated copy of a PowerPoint presentation on distracted driving prepared by a NHTSA Senior Highway Safety Specialist, Liza Lemaster-Sandbank.  Suppl. *Vaughn* Index at 4.  The presentation is aimed at advising internal Federal agencies about driver distraction risks and considerations across vehicle fleets.   *Id.*   It describes applicable NHTSA policies and observations on driver distraction incidence and mitigations, as well as internal Department of Transportation activities to mitigate driver distraction in its own fleets.  *Id.*  The file is annotated with Ms. Lemaster-Sandbank's own presenter notes, which reflect her personal notations to herself about possible topics to cover on each slide, how to structure any resulting discussions on the topics, and which issues to emphasize.  *Id.*  The presentation is an attachment to the email that appears on  NHTSA-ES19-004222-000247,  in  which  Ms.  Lemaster-Sandbank  sends  the presentation to the Chief of the Human Factors/Engineering Integration Division, Chris Monk.  *Id.*

Fifth, Plaintiff highlights NHTSA-ES19-004222-001327–28.  Pl.'s Br. at 13.  As Defendant described initially, these are "[i]nternal notes, calendar invite, and anticipated summary of meeting regarding Agency activities relating to evaluation of driver distraction measurements."  *Vaughn* Index for Withholdings at 6.  More specifically, this is a meeting invitation from Elizabeth Mazzae, a research engineer at NHTSA who performed much of the day-to-day work on the proposed Phase 2 Guidelines, to other NHTSA personnel to summarize NHTSA research on driver distraction

---

[3]    This record ends on page 000282, not 000284.  *Cf.* Pl.'s Br. at 13.  Defendant has nevertheless provided updated entries for the record at pages 000283 and 000284, too.  *See* Suppl. *Vaughn* Index at 4.

measurements for auditory-vocal tasks.  Suppl. *Vaughn* Index at 13.  The invitation list for the meeting includes Ryan Hagen, an Attorney-Advisor in the NHTSA Office of Chief Counsel, whose work included the responsibility for the day-to-day legal oversight and review of matters pertaining to the Phase 2 Guidelines.  *Id.*  The other NHTSA personnel on the invitation primarily consist of other NHTSA researchers (such as the Chief of the Human Factors/Engineering Integration Division, Chris Monk, and Tim Johnson, the Director of NHTSA's Vehicle Research and Test Center) and engineers in NHTSA's rulemaking division (such as David Hines, NHTSA's Director, Office of Crash Avoidance Standards).  *Id.*  This internal meeting consisted of a briefing on the research, and the redacted portion of the meeting invite describes the scope of the research, its results, and preliminary conclusions.  *Id.*  The final report for this research (Report No. DOT HS 812 800) is publicly available for download.  *Id.* (citing Repository & Open Science Access Portal, *Detection Response Task Evaluation for Driver Distraction Measurement for Auditory-Vocal Tasks: Experiment 2*, Sept. 1, 2019, https://rosap.ntl.bts.gov/view/dot/43664).

Sixth, Plaintiff highlights NHTSA-ES19-004222-003704–05.  Pl.'s Br. at 13.  As Defendant described initially, this is an [i]nternal email chain between personnel at NHTSA and [the Volpe National Transportation Systems Center ("Volpe")] regarding potential activities, timing, and scopes of work relating to driver distraction issues."  *Vaughn* Index for Withholdings at 10.  More specifically, in this email chain, NHTSA corresponds with another component of the Department of Transportation, Volpe, which is assisting with NHTSA's review and assessment of public comments received on the proposed Phase 2 Guidelines.  Suppl. *Vaughn* Index at 29.  In the earlier email of this chain, the Chief of the Human Factors/Engineering Integration Division, Chris Monk, emails two human factors researchers at Volpe, Dr. Eric Nadler and Dr. Donald Fisher, to describe how Volpe can assist with the comment review process.  *Id.*  The email contains a

description of the scope of the review, the timing for the review process, and information about what types of information and issues would be useful to be cognizant of while reviewing the comments. *Id.* The subsequent emails in this chain consist of the back-and-forth between Volpe and NHTSA about the status of this project and Volpe's initial impressions during the review. *Id.*

Thus, each of these records is part of the deliberative process for the proposed Phase 2 Guidelines. Defendant has identified the deliberative process involved and has averred that the proposed Phase 2 Guidelines remain in a predecisional and deliberative state.

B.    **Defendant Has Demonstrated the Role the Withheld or Redacted Records Played in the Deliberative Process.**

Defendant demonstrated the role the withheld or redacted records played in the deliberative process through its descriptions of six separate categories of records. *See* Def.'s Br. at 13–16. Below, Defendant further explains the role for each of the records that Plaintiff has called out in his response.

First, Plaintiff highlights NHTSA-ES19-004222-001332-42. Pl.'s Br. at 12. This was a Category #1 record (internal communications between agency personnel regarding outside inquiries or public statements relating to the proposed Phase 2 Guidelines). Humphrey Decl. (ECF No. 20-5) ¶ 37, n.1. As Defendant previously explained, the role played by Category #1 documents was to react to outside inquiries or public statements regarding the proposed Phase 2 Guidelines, suggest how to respond, provide draft feedback requests on related language, and respond to comments and recommendations. *Id.* ¶ 37.

As demonstrated in the context of this particular record, this record involved a discussion as to how to respond to an external media question about the safety impact of voice assistants and other interactive vehicle dashboard features. Suppl. *Vaughn* Index at 13. It reflects NHTSA personnel's thoughts and discussion about how to approach a response, as well as draft language

12

proposed first by a NHTSA public affairs employee and then revised by the Chief of the Human Factors/Engineering Integration Division and the Director of NHTSA's Office of Vehicle Crash Avoidance and Electronic Controls Research. *Id.* This record demonstrates an effort to deliberate over the best way to phrase and approach a possible response to the question. *Id.*

Second, Plaintiff highlights NHTSA-ES19-004222-000014. Pl.'s Br. at 13. This was a Category #5 record (the internal exchange of information, ideas, and recommendations that occurred during NHTSA personnel's work on the day-to-day projects that arose as the agency continued to develop the Phase 2 Guidelines). Humphrey Decl. ¶ 41, n.5. As Defendant previously explained, the role played by Category #5 documents was to "formulate strategies and approaches for possible next steps or assess options in connection with those proposed [Phase 2] Guidelines." *Id.* ¶ 41.

As demonstrated in the context of this particular record, the role this Category #5 record played in the deliberative process was to set an agenda for a meeting with NHTSA personnel in the Human Factors/Engineering Integration Division (including the Chief, Chris Monk) and agency contractors regarding the proposed Phase 2 Guidelines to discuss updates of ongoing activities, comments on outstanding deliverables, items for proposed NHTSA discussion, and action items as takeaways from the meeting. Suppl. *Vaughn* Index at 1. The meeting then guided the discussion to permit NHTSA to deliberate on the proposed Phase 2 Guidelines. *Id.*

Third, Plaintiff highlights NHTSA-ES19-004222-000186. Pl.'s Br. at 13. Again, as Defendant noted above, this page was produced in full. *See supra*. In any event, this was part of a Category #5 record. Humphrey Decl. ¶ 41, n.5. More specifically, the presentation for which it is a part (which was redacted in certain instances) describes the objectives of potential work relating to the proposed Phase 2 Guidelines, the specific timeframes for future studies under

13

consideration, ideas for possible tasks and scopes for those driver distraction studies, and considerations for identifying potential test procedures and objectives. Suppl. *Vaughn* Index at 4.

Fourth, Plaintiff highlights NHTSA-ES19-004222-000248–82. Pl.'s Br. at 13. This was also a Category #5 record. Humphrey Decl. ¶ 41, n.5. More specifically, this presentation was aimed at advising internal Federal agencies about driver distraction risks and considerations across vehicle fleets. Suppl. *Vaughn* Index at 4.

Fifth, Plaintiff highlights NHTSA-ES19-004222-001327–28. Pl.'s Br. at 13. This was also a Category #5 record. Humphrey Decl. ¶ 41, n.5. More specifically, the redacted portion of the meeting invite describes the scope of certain research, its results, and preliminary conclusions. Suppl. *Vaughn* Index at 13.

Sixth, Plaintiff highlights NHTSA-ES19-004222-003704–05. Pl.'s Br. at 13. This was also a Category #5 record. Humphrey Decl. ¶ 41, n.5. More specifically, this record describes how Volpe, which is another Department of Transportation component, can assist with the comment review process. Suppl. *Vaughn* Index at 29. In this record, Volpe provided NHTSA with its initial impressions. *Id.*

Similarly, the Humphrey Declaration explains the roles played by records falling into the other categories. Humphrey Decl. ¶¶ 38–40. For Category #2 records (internal communications between agency personnel regarding briefings, including apprising agency leadership, on issues relating to the proposed Phase 2 Guidelines), the role played by these records was to draft documents, prepare, review, and edit briefing materials, communicate about possible topics, content, and approaches to cover in such briefings (including specific language and internal analysis), discuss future briefings that may be necessary, and prepare and edit briefing materials (including drafts) themselves. *Id.* ¶ 38.

14

For Category #3 records (internal communications between agency personnel pertaining to comments received on the proposed Phase 2 Guidelines), the role was to seek assistance with review of the proposed Phase 2 Guidelines, evaluate and summarize comments and related issues, convey individual staff impressions regarding responses to various comments, explain how comments were internally categorized and organized for purposes of evaluation, analyze the organization of comments, plan for future work (including setting up meetings and preparing draft documents), provide updates on the status of reviews, and communicate regarding associated draft documents. *Id.* ¶ 39.

For Category #4 records (internal communications between agency personnel pertaining to various draft agency documents relating to the proposed Phase 2 Guidelines), the role was to discuss status updates and remaining steps for ongoing agency activities, seek review and input on daily work of agency staff, discuss anticipated timelines, discuss feedback and summaries of ongoing work, describe potential future actions under consideration (including statements of work), provide cost estimates for work under consideration, and provide strategies and approaches to consider. *Id.* ¶ 40.

Accordingly, Defendant has explained the role its records played.

**C.     Defendant Has Provided Information about the Decisionmaking Authority of the Individuals Included in the Records.**

The initial Fish Declaration identified the key individuals involved in the proposed Phase 2 Guidelines and appearing in NHTSA's records, and it explained their roles. *See* Fish Decl. (ECF No. 20-3) ¶ 16. Moreover, the information outlined below even further illustrates the decisionmaking authority of the individuals included in the specific records called out by Plaintiff. Defendant demonstrates that these records involved more junior individuals corresponding with more senior individuals, which makes it even "more likely" that the records reflect the deliberative

15

process. *See Access Reports v. Dep't of Just.*, 926 F.2d 1192, 1195 (D.C. Cir. 1991). Defendant reiterates that this is a representative sample of the documents it has withheld or redacted, a sample which was effectively chosen by Plaintiff, not Defendant. Defendant refers to its Supplemental *Vaughn* Index for the decisionmaking authority for individuals on additional records.

First, Plaintiff highlights NHTSA-ES19-004222-001332-42. Pl.'s Br. at 12. The redacted email that appears on NHTSA-ES19-004222-001333 is from Derrell Lyles, a NHTSA public affairs employee, who forwards a media question to Chris Monk, the Chief of the Human Factors/Engineering Integration Division at NHTSA, and to Nat Beuse, NHTSA's Associate Administrator for Vehicle Safety Research. Suppl. *Vaughn* Index at 13. Thus, this is an email from someone more junior to individuals who are more senior, including the Chief. *See id.* While Mr. Beuse then forwards the email to other staff engineers in his Division, he does not dictate a response, but rather requests Mr. Lyles to work with Cem Hatipoglu, the Director of NHTSA's Office of Vehicle Crash Avoidance and Electronic Controls Research, on preparing a response. *Id.*

Second, Plaintiff highlights NHTSA-ES19-004222-000014. Pl.'s Br. at 13. This draft meeting agenda was prepared by a contractor (*i.e.,* the Battelle Center) and sent by Christian Richard (Senior Scientist at the Battelle Center) to NHTSA personnel in the Human Factors/Engineering Integration Division (including the Chief, Chris Monk), and agency contractors. Suppl. *Vaughn* Index at 1. Again, this is an email from someone in a more junior position to someone more senior. *See id.*

Third, Plaintiff highlights NHTSA-ES19-004222-000186. Pl.'s Br. at 13. This draft slide deck, which was prepared by the Battelle Center, is sent by Eric Traube, a NHTSA research engineer who performed much of the work on the day-to-day activities for the proposed Phase 2 Guidelines to the Chief of the Human Factors/Engineering Integration Division, Chris Monk, and

16

others, for their review.  Suppl. *Vaughn* Index at 4.  Thus, this is also an email from someone in a more junior position to someone more senior.  *See id.*

Fourth, Plaintiff highlights NHTSA-ES19-004222-000248–82.  Pl.'s Br. at 13.  This is a presentation sent by a NHTSA Senior Highway Safety Specialist, Liza Lemaster-Sandbank, which contains her personal annotations, to the Chief of the Human Factors/Engineering Integration Division, Chris Monk.  Suppl. *Vaughn* Index at 4.  Again, this is an email from someone in a more junior position to someone more senior.  *See id.*

Fifth, Plaintiff highlights NHTSA-ES19-004222-001327–28.  Pl.'s Br. at 13.  This is a meeting invitation from Elizabeth Mazzae, a research engineer at NHTSA who performed much of the day-to-day work on the proposed Phase 2 Guidelines, to the Chief of the Human Factors/Engineering Integration Division, Chris Monk, and to the Director of NHTSA's Vehicle Research and Test Center, Tim Johnson, along with other individuals.  Suppl. *Vaughn* Index at 13.  Again, this is an email from someone in a more junior position to someone more senior.  *See id.*

Sixth, Plaintiff highlights NHTSA-ES19-004222-003704–05.  Pl.'s Br. at 13.  This record consists of the back-and-forth between two human factors researchers at Volpe, Dr. Eric Nadler and Dr. Donald Fisher, and NHTSA's Chief of the Human Factors/Engineering Integration Division, Chris Monk, about the status of this project and Volpe's initial impressions during the review.  Suppl. *Vaughn* Index at 13.  Thus, this is also a record involving more junior individuals providing their initial impressions to someone more senior.  *See id.*

Since Plaintiff continues to challenge nearly every redaction across the almost 4,000-page production, it is impracticable to provide the identities of every individual on every record it has redacted or withheld.  Nevertheless, it is telling that each of the records in this representative sample involves someone more junior providing initial impressions to someone more senior.  As

17

the D.C. Circuit has explained, "[a] document from a junior to a senior is likely to reflect his or her own subjective opinions and will clearly have no binding effect on the recipient." *Access Reports*, 926 F.2d at 1195. Importantly, the D.C. Circuit has blessed the notion that this Court may rely on a representative sample of records, rather than requiring Defendant to provide this information for each and every record redacted or withheld. *See Reps. Comm.*, 3 F.4th at 368 ("To the extent that [plaintiffs] suggest that the district court erred in relying on a representative sample . . . of the documents at issue, they are mistaken. . . . Courts, in fact, routinely review sample documents to determine whether exemptions have been appropriately claimed."). Accordingly, Defendant has provided a representative sample of the decisionmaking authority of the individuals included in the records selected by Plaintiff, and Defendant has demonstrated that this fact serves only to buttress Defendant's arguments that it has properly claimed Exemption 5.

**D.      Defendant Has Disclosed Factual Information.**

Plaintiff's bald assertion that "NHTSA has withheld numerous documents that likely contain factual information" is mere speculation that cannot defeat summary judgment. Pl.'s Resp. at 18; *see also Carlborg*, 2020 WL 4583270, at *6 ("[T]he record contains no evidence to support these claims, and the [agency] is afforded 'a presumption of good faith, which cannot be rebutted by purely speculative claims.'") (quoting *SafeCard*, 926 F.2d at 1200).

In any event, as the D.C. Circuit has explained, "the legitimacy of withholding does not turn on whether the material is purely factual in nature or whether it is already in the public domain, but rather on whether the selection or organization of facts is part of an agency's deliberative process." *Ancient Coin Collectors Guild v. Dep't of State*, 641 F.3d 504, 513 (D.C. Cir. 2011). For instance, the D.C. Circuit will "uph[o]ld non-disclosure under Exemption 5 of 'factual material . . . assembled through an exercise of judgment in extracting pertinent material from a vast number

18

of documents for the benefit of an official called upon to take discretionary action.'" *Id.* (quoting *Mapother v. Dep't of Just.*, 3 F.3d 1533, 1539 (D.C. Cir. 1993)).

Plaintiff highlights two documents as possible examples in which Defendant might have improperly redacted factual information: (1) NHTSA-ES19-004222-000001; and (2) NHTSA-ES19-004222-001169-1172. Pl.'s Br. at 18–19. It is not enough to prove that Defendant redacted factual information, but rather the information redacted, even if factual, must also not have been selected or organized as part of NHTSA's deliberative process. *Ancient Coin*, 641 F.3d at 513.

First, Plaintiff points to NHTSA-ES19-004222-000001. Pl.'s Br. at 18. This is a draft meeting agenda provided by the Battelle Center, which was a contractor for NHTSA that performed work for NHTSA regarding the proposed Phase 2 Guidelines. Suppl. *Vaughn* Index at 1. The email transmitting this agenda is reflected in NHTSA-ES19-004222-000002, which is an email from Christian Richard (Senior Scientist at the Battelle Center) to NHTSA personnel in the Human Factors/Engineering Integration Division (including the Chief, Chris Monk) and agency contractors. *Id.* This agenda is dated November 20, 2018, and it concerns a biweekly meeting of this group to coordinate work on conformance testing for the proposed Phase 2 Guidelines. *Id.* The agenda is in an outline format, which includes sections describing updates of ongoing activities, comments on outstanding deliverables, items for proposed NHTSA discussion, and summaries of action items for each of the respective participants in the meeting. *Id.* These bullet points propose potential follow-up items for individual members of the team and list anticipated discussion points about items under consideration for the conformance testing work. *Id.* This is not mere factual information, and even if portions of it could be deemed to be factual, the selection or organization of the facts would be protected under the deliberative process. *See Ancient Coin*, 641 F.3d at 513.

19

Second, Plaintiff points to NHTSA-ES19-004222-001169–72 as an example of a "cost estimate" record that Plaintiff urges should be disclosed in unredacted form. Pl.'s Br. at 19. More specifically, this is a draft of a chart estimating costs associated with a party's compliance with the proposed Phase 2 Guidelines. Suppl. *Vaughn* Index at 11. This document is an attachment to an email sent by Dr. Donald Fisher, who is the principal technical advisor in Surface Transportation Human Factors at Volpe, which assisted NHTSA with the review of the comments for the proposed Phase 2 Guidelines. *Id.* This email transmits Volpe's working draft of an estimate for the costs of compliance with the Guidelines by a hypothetical entity. *Id.* Dr. Fisher sends the email to the Chief of the Human Factors/Engineering Integration Division, Chris Monk, as well as another colleague at Volpe. *Id.* The redactions consist of a chart of itemized projected costs and Dr. Fisher's commentary on the scope and nature of the assessment. *Id.*

As Plaintiff recognizes, "[j]ust like other data-driven estimates and calculations, cost estimates may be deliberative when they reflect the selections of lower-level employees and require the sort of factual selection and curating reflective of agency decisionmaking." Pl.'s Br. at 19. That is exactly the case here. The "cost estimate" issue in this case is similar to that presented in *Quarles v. Department of Navy*, 893 F.2d 390 (D.C. Cir. 1990). In that case, like here, Plaintiff "would have [the Court] characterize the cost estimates as fact." *Id.* at 392. The D.C. Circuit rejected this argument, noting that "[n]umbers have a surface precision that may lead the unsophisticated to think of them as fixed, and of course some are—Waterloo was fought in 1815." *Id.* "But cost estimates such as these are far from fixed, as anyone knows who has had two contractors bid on a home improvement or has compared budget estimates with final costs of a government project"; indeed, "[t]hey derive from a complex set of judgments—projecting needs, studying prior endeavors and assessing possible suppliers" and "partake of just that elasticity that

20

has persuaded courts to provide shelter for opinions generally." *Id.* at 392–93. Given the number of assumptions that Dr. Fisher needed to make to reach his cost estimates for a hypothetical entity, this sort of information is much more clearly an opinion than is the fact that Waterloo was fought in 1815. *Id.* Accordingly, Defendant properly shielded these sorts of cost estimates for hypothetical entities from disclosure. *See id.*

### E.    Defendant Has Demonstrated Foreseeable Harm.

Plaintiff urges that Defendant has not identified the foreseeable harm that would ensue from disclosure of each of Defendant's categories, but Defendant addressed the foreseeable harm for each category of documents in its opening brief. *See* Def.'s Br. at 17–18. Plaintiff acknowledges that "[a]gencies may "sometimes satisfy that burden [to demonstrate foreseeable harm] on a category-by-category basis rather than a document-by-document basis—'that is, group together like records' and explain the harm that would result from release of each group.'" Pl.'s Br. at 25 (quoting *Reps. Comm.*, 3 F.4th at 371). That is precisely what Defendant has done here.

Plaintiff urges that Defendant has not identified the foreseeable harm that would ensue from disclosure of Category #4 records (internal communications between agency personnel pertaining to various draft agency documents relating to the proposed Phase 2 Guidelines). Pl.'s Br. at 26–27. While Plaintiff rightfully notes that agencies must not rely on "rote invocations" of foreseeable harm, *id.* at 25, Plaintiff appears to take issue with Defendant's omission of formulaic labels of foreseeable harm in favor of Defendant's more detailed explanation of the harm that would ensue from disclosure. Specifically, Defendant explained that disclosure of Category #4 records would cause foreseeable harm because "[a]gency employees need the freedom and flexibility to write, rewrite, and seek input on documents in order to refine those materials into versions suitable for providing recommendations to leadership or accurately and effectively conveying information to the public." Humphrey Decl. (ECF No. 20-5) ¶ 40. As explained in the

21

initial Fish Declaration, "if [NHTSA] personnel anticipated that their collaborative input would become subject to general publication, they would feel much more constrained in [their] expressions of opinions and conveyance of recommendations, undermining the quality and candidness of analysis and work products.  Indeed, [Ms. Fish] personally would feel much more constrained."  Fish Decl. (ECF No. 20-3) ¶ 20.

Plaintiff also urges that Defendant has failed to identify foreseeable harm for Category #5 records (the internal exchange of information, ideas, and recommendations that occurred during the course of NHTSA personnel's work on the day-to-day projects that arose as the agency continued to develop the Phase 2 Guidelines).  Pl.'s Br. at 30 (citing Humphrey Decl. ¶¶ 41–43). Plaintiff does not contest that the allegations of foreseeable harm that Defendant provided were inadequate in and of themselves, but rather that Category #5 purportedly groups together different types of documents.  *Id.*  Indeed, Plaintiff could not fairly dispute the adequacy of Defendant's explanation of foreseeable harm: "If subject to disclosure, these types of critical daily collaborations risk becoming chilled altogether, but to the extent they continued, they would become much more formalized in a manner that would dramatically undermine the efficiency and effectiveness of the communications"; furthermore, "[s]ince these types of communications comprise so much of the daily work of the agency, and permeate through practically all agency activities, such an effect would severely undermine NHTSA's safety mission."  Humphrey Decl. ¶ 43.

As Defendant explained, Defendant grouped together these records because they all "reflected the day-to-day activities of staff level agency" performing work on the proposed Phase 2 Guidelines.  *Id.* ¶ 42.  Regardless as to whether particular records in this category are "internal presentations (and drafts of those presentations), draft agendas for internal meetings, deliverables

or draft deliverables from contractors that were meant to support the agency's ongoing work, requests for assistance and input from employees to one another, [or] discussions about the best ways to phrase various documents or emails," *id.*, the foreseeable harm in disclosure is the same. *Id.* ¶ 43. If subject to disclosure, critical daily collaborations risk becoming chilled altogether, but to the extent they continued, they would become much more formalized in a manner that would dramatically undermine the efficiency and effectiveness of the communications, which would "severely undermine NHTSA's safety mission." *Id.*

With respect to the remaining first three categories, Plaintiff incorrectly claims that Defendant's foreseeable harm allegations were made only in the context of specific records. Pl.'s Br. at 31–33. That is wrong. *See* Humphrey Decl. ¶ 37 (Category #1: "Disclosure of such communications would further reveal the agency's internal process for handling inquiries that regard an agency project that remains at a predecisional stage. Moreover, if such internal communications were disclosable, agency personnel would become hesitant to candidly discuss ideas or proposals for responding to such outside requests, including media inquiries. This would not only make it more difficult for NHTSA to consistently convey its public safety message but would also harm transparency as it would become more difficult for the agency to critically consider what types of information could be shared upon a public request.");[4] *id.* ¶ 38 (Category #2: "The release of such communications would further reveal the agency's internal processes and approaches for preparing for and meeting with stakeholders on a subject that relates to a project

---

[4]    Plaintiff objects to foreseeable harm in the context of a particular Category #1 record, NHTSA-ES19-004222-001332–42, because "[t]here is no explanation for why releasing a now-years-old media request, which does not even mention Phase 2, might somehow harm the agency's substantive deliberations on the guidelines." Pl.'s Br. at 31. The problem with Plaintiff's argument is that Defendant did indeed release the media request. Suppl. *Vaughn* Index at 13. Defendant's redactions were for deliberations regarding how, if NHTSA were to respond to the request, it should do so. *Id.*

undergoing internal agency deliberations for which next steps and options have yet to be finalized. Disclosing such internal briefing material would harm the agency, as its staff would be less likely to include sensitive information in future briefings or raise questions or proposals for which further discussion was needed to arrive at recommended decisions on future agency positions.  Moreover, memorializing these internal agency briefings, whether through briefing outlines, memorandums, or PowerPoint presentations, is a critical step in ensuring agency staff are able to brief their leadership in an understandable and organized manner.  Rendering such briefing materials disclosable would diminish the agency's ability to prepare such critical tools of advising leadership in order to provide them with the requisite context to make informed decisions."); *id.* ¶ 39 (Category #3: "Treating such material as disclosable would substantially undermine NHTSA's ability to evaluate public comments and clearly explain to the public how NHTSA responds to the views expressed in the comments. . . . [D]isclosing comment evaluations prepared by a single individual or a small group of NHTSA personnel would reveal only the preliminary views of that individual or small group, at whatever time the document was prepared.  This would substantially undermine the agency's rulemaking processes and lead to public confusion about how the agency views particular topics on which the public has provided input.  Such a risk is especially prominent in a situation, such as here, where NHTSA has not otherwise published a final notice that reflects the agency's impressions relating to public comments, so any disclosed work product of an individual employee is especially likely to be mistaken for the views of the entire agency.").[5]

---

[5]    Plaintiff objects to foreseeable harm in the context of a particular Category #3 record, NHTSA-ES19-00422-003703, because it purportedly contains a mere status update.  Pl.'s Br. at 32.  That record contains a description of the scope of the review, the timing for the review process, and information about what types of information and issues would be useful to be cognizant of while reviewing comments.  Suppl. *Vaughn* Index at 29.

Accordingly, Defendant has identified with specificity the foreseeable harm that would ensue from disclosure of each category of records.

## II.   Defendant's Justification of its Attorney-Client Privilege Claims Is Logical and Plausible.

Plaintiff provides citations to cases not concerning the attorney-client privilege to try to establish the burden for Defendant to assert the privilege. *See* Pl.'s Br. at 20 (citing *Campbell v. Dep't of Just.*, 164 F.3d 20, 30 (D.C. Cir. 1998), and *Hayden v. Nat'l Sec. Agency*, 608 F.2d 1381 (D.C. Cir. 1979)). As the D.C. Circuit has explained, an agency claiming the attorney-client privilege to invoke Exemption 5 must "adequately demonstrate[] that the information in those documents was communicated to or by an attorney as part of a professional relationship in order to provide the [agency] with advice on the legal ramifications of its actions." *Mead Data Cent., Inc. v. Dep't of Air Force*, 566 F.2d 242, 253 (D.C. Cir. 1977). The agency must also demonstrate that it has maintained the confidentiality of the communication. *Id.* at 253–54; *see also Hunton & Williams LLP v. EPA*, 248 F. Supp. 3d 220, 256 (D.D.C. 2017) (Contreras, J.) (finding that agency sufficiently met its burden of demonstrating confidentiality by submitting a "supplemental declaration [that] states that '[t]he documents withheld in accordance with the Attorney-Client Privilege were internal documents only and were not released to third parties'").

### A.   Defendant Has Maintained Confidentiality.

Defendant asserts that its initial *Vaughn* indices and opening declarations adequately demonstrated that it has maintained confidentiality over these records. For instance, the Humphrey Declaration averred that "all these communications [*i.e.,* the records for which Defendant claimed attorney-client privilege] were intended to be kept confidential, and that confidentiality has been maintained." Humphrey Decl. (ECF No. 20-5) ¶ 47. The Supplemental Fish Declaration further confirms, using language similar to that found satisfactory in *Hunton*, that "all the information

withheld by NHTSA in response to Plaintiff's FOIA request as subject to the attorney-client privilege was intended to be kept confidential and expected to be kept confidential at the time of the communication of the information, and confidentiality has been maintained since."  Suppl. Fish Decl. (ECF No. 20-3) ¶ 11.  Accordingly, Defendant has adequately supported its claim that it has maintained confidentiality over these records.  *See Hunton*, 248 F. Supp. 3d at 256.

> **B.     These Records Were Communicated to or by an Attorney to Provide NHTSA with Legal Advice.**

Throughout both its opening brief and pre-litigation conferrals with Plaintiff, NHTSA consistently identified a number of the records in this production as communications of agency counsel providing legal advice or draft work product to NHTSA's program office.  Nevertheless, Plaintiff continues to challenge almost every single one of these records as improperly redacted or withheld.  The additional information Defendant has now provided for each and every attorney-client privilege claim continues to demonstrate that these records were communicated to or by an attorney as part of a professional relationship in order to provide NHTSA personnel with advice on the legal ramifications of their actions. *See Mead*, 566 F.2d at 253; *see also* Suppl. *Vaughn* Index.  Below, Defendant focuses on the six records cited in the attorney-client privilege section of Plaintiff's opening brief; however, Defendant's Supplemental *Vaughn* Index provides further information regarding every record for which Defendant claimed attorney-client privilege.  *See generally id.*

First, Plaintiff highlights NHTSA-ES19-004222-001349.  Pl.'s Br. at 21.  This is an email from Ryan Hagen, an Attorney-Advisor in the NHTSA Office of Chief Counsel, whose work included the responsibility for the day-to-day legal oversight and review of matters pertaining to the proposed Phase 2 Guidelines.  Suppl. *Vaughn* Index at 14.  The attorney also cc'd his supervising attorney, Steve Wood, who was NHTSA's Assistant Chief Counsel for Vehicle Safety

Standards and Harmonization. *Id.* In the email, Attorney-Advisor Hagen sends a message to the Chief of the Human Factors/Engineering Integration Division, Chris Monk, and NHTSA's Associate Administrator for Vehicle Safety Research, Nat Beuse. The entirety of the message consists of the attorney advising the members of NHTSA's program office of a letter received by the Department of Transportation from the Consumer Technology Association. *Id.* The email contains the attorney's impressions regarding the content of the letter, the legal issues raised in the letter, and the aspects of the letter that are potentially relevant to NHTSA's work on the Guidelines. *Id.*

Second, Plaintiff highlights NHTSA-ES19-004222-001371. Pl.'s Br. at 21. This is a chart entitled "Comment Resolution Form." Suppl. *Vaughn* Index at 14. This chart is used by the NHTSA Research Division to keep track of input received from NHTSA's Office of the Chief Counsel following the legal review of test procedure documents for the proposed Phase 2 Guidelines. *Id.* The chart is a table that lists each comment from the attorneys, the program office's explanation of how each comment was addressed or responded to, and the status of each comment. *Id.*

Third, Plaintiff highlights NHTSA-ES19-004222-001822. Pl.'s Br. at 21. This is an email from Heidi King, NHTSA Deputy Administrator, to Derek Kan, Under Secretary of Transportation for Policy for the Department of Transportation and Finch Fulton, Deputy Assistant Secretary for Transportation Policy, and copying NHTSA's Chief Counsel, Jonathan Morrison. Suppl. *Vaughn* Index at 18. The email discusses potential talking points for an upcoming meeting with the DOT Secretary, Elaine Chao. *Id.* One of the principal reasons for attorneys in the NHTSA Office of Chief Counsel, such as the Chief Counsel, to be closely involved in the day-to-day work on these talking points is to assist with the identification of potential legal issues and help ensure the

27

agency's positions and language are consistent with both statutory and regulatory requirements. Suppl. Fish Decl. ¶ 9; *see also Bartholomew v. Avalon Capital Grp., Inc.*, 278 F.R.D. 441, 448 (D. Minn. 2011) ("Plaintiffs contend that Defendant cannot assert attorney-client privilege for all communications in which [the attorney] was not an author or direct recipient and, instead, was a carbon-copy recipient. . . . [T]he mere use of the carbon copy feature on e-mail software is not *prima facie* evidence that the communication is not a privileged communication.").

Fourth, Plaintiff highlights NHTSA-ES19-004222-002834. Pl.'s Br. at 21. The redacted page is a draft document that responds to potential cost estimates for the proposed Phase 2 Guidelines. Suppl. *Vaughn* Index at 26. As reflected in the parent email, this draft was prepared following discussions with Ryan Hagen, who was an Attorney-Advisor in the NHTSA Office of Chief Counsel whose work included the responsibility for the day-to-day legal oversight and review of matters pertaining to the Phase 2 Guidelines. *Id.* This document was provided to counsel for the purpose of obtaining legal advice, and Mr. Hagen thereafter returned the document with redlines and comments reflecting his legal advice at NHTSA-ES19-004222-002837. *Id.*

Fifth, Plaintiff highlights NHTSA-ES19-004222-002837. Pl.'s Br. at 21. This is the record referred to in the preceding paragraph, in which Attorney-Advisor Hagen provided his legal advice regarding the potential cost estimates. Suppl. *Vaughn* Index at 26.

Sixth, Plaintiff highlights NHTSA-ES19-004222-000157–60. Pl.'s Br. at 21. That document is a memorandum from Tim Johnson, the Director of NHTSA's Vehicle Research and Test Center to Nat Beuse, NHTSA's Associate Administrator for Vehicle Safety Research. Suppl. *Vaughn* Index at 3. The memorandum describes draft test procedures regarding NHTSA's Driver Distraction Guidelines. *Id.* It contains a synopsis of NHTSA's internal process for the preparation and review of the test procedures, which includes a description of input or concurrence from

28

NHTSA Divisions and a description of how such input was incorporated into an updated draft of the document. *Id.* The memorandum describes legal advice offered by the NHTSA Office of Chief Counsel. *Id.*

Based on a review of these representative records, Defendant has adequately demonstrated that the information in those records was communicated to or by an attorney as part of a professional relationship to provide NHTSA with advice on the legal ramifications of its actions. *See Mead Data*, 566 F.2d at 253.

**C.** **Defendant Has Identified the Foreseeable Harm That Would Ensue If the Records Were Disclosed.**

Plaintiff urges that Defendant has made no showing of the foreseeable harm that would ensue if attorney-client communications were disclosed. Pl.'s Br. at 27–28. As this Court has explained, "'[w]hen invoking the attorney-client privilege,' unlike the deliberative process privilege, 'an agency likely does not need to reach far beyond the fact of disclosure to show foreseeable harm.'" *Selgjekaj v. Exec. Off. for U.S. Att'ys*, Civ. A. No. 20-2145 (CRC), 2021 WL 3472437, at *5 (D.D.C. Aug. 6, 2021), *appeal docketed*, No. 21-5264 (D.C. Cir.) (quoting *Ecological Rights Found. v. EPA*, Civ. A. No. 19-0980 (BAH), 2021 WL 535725, at *32 (D.D.C. Feb. 13, 2021)). It is "hardly debatable" that an agency would suffer foreseeable harm "if its attorneys were deprived of 'a zone of privacy within which to think, plan, weigh facts and evidence, candidly evaluate a client's case, and prepare legal theories.'" *Id.* (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 864 (D.C. Cir. 1980)) (internal quotation marks omitted).

Defendant provided a detailed explanation as to the foreseeable harm that would stem from disclosure of attorney-client communications. *See* Fish Decl. (ECF No. 20-3) ¶ 22. As Attorney Advisor Hannah Fish averred in her initial Declaration: "In [her] role as agency counsel, [she]

29

depend[s] on the ability to provide candid thoughts based on [her] legal knowledge to others at NHTSA, without concern about potential subsequent disclosure of those communications." *Id.* In fact, it is "critical that program office employees feel comfortable freely forwarding [the Attorney Advisor] updates or otherwise passing along information to keep [her] updated on the status of projects or to solicit legal advice." *Id.* These "communications are crucial for issue-spotting potential legal concerns or considerations early enough to address any issues before the program office recommends specific actions to leadership or otherwise dedicates resources towards a particular objective." *Id.* "All of this requires a free and open environment in which to provide professional advice." *Id.* "When such communications become subject to public release, it may constrain the candidness of the input, make many individuals reluctant to provide as frequent or informal of daily status updates, and result in a negative impact on the overall work product." *Id.* Thus, Defendant has identified the foreseeable harm in the context of its attorney-client communications. *Id.*

## III.    Defendant's Justification of its Attorney Work Product Claims Is Logical and Plausible.

In addition to constituting privileged attorney-client communications, several of these withheld records also represent protectable attorney work product. The attorney work-product doctrine protects "the mental impressions, conclusions, opinions, or legal theories of an attorney," as well as "factual materials prepared in anticipation of litigation." *Tax Analysts v. IRS*, 117 F.3d 607, 620 (D.C. Cir. 1997) (quotation marks omitted). This rule is rooted in the principle that "it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel." *Hickman v. Taylor*, 329 U.S. 495, 510 (1947). Plaintiff's only argument against Defendant's work product claims is that Defendant purportedly "has not

30

established the litigation that the withheld documents were prepared in anticipation of." Pl.'s Br. at 23.

As the D.C. Circuit has explained, there is no requirement of "a specific claim before lawyers preparing for the possibility of litigation can claim work-product protection." *In re Sealed Case*, 146 F.3d 881, 887 (D.C. Cir. 1998). Indeed, "[i]t is often prior to the emergence of specific claims that lawyers are best equipped either to help clients avoid litigation or to strengthen available defenses should litigation occur." *Id.* at 886. "Weakening the ability of lawyers to represent clients at the pre-claim stage of anticipated litigation would inevitably reduce voluntary compliance with the law, produce more litigation, and increase the workload of government law-enforcement agencies." *Id.* at 887. Accordingly, Defendant merely must show that "litigation was a real possibility," regardless as to the ultimate merits of that litigation. *Id.* at 884.

Incredibly, even Plaintiff anticipates the possibility of litigation if the proposed Phase 2 Guidelines come into effect. *See* Pl.'s Decl. (ECF No. 23-2) ¶ 21(c) (acknowledging that "comments filed by industry groups opposed the issuance of Phase II guidelines" and questioning whether "the industry threaten[ed] litigation if NHTSA issued Phase II guidance"). NHTSA does indeed reasonably anticipate litigation, especially given the comments opposing the proposed Phase 2 Guidelines. *See* Suppl. Fish Decl. ¶ 9. The proposed Phase 2 Guidelines attracted significant attention: "NHTSA received a substantial number of comments (1,797) in response to its notice proposing the Phase 2 Guidelines, a number of which provided substantive and complex comments." *Id.* "[W]hen there is a high level of interest coupled with such comments, including critical comments from sophisticated stakeholders such as there were in response to the proposed Phase 2 Guidelines (including about NHTSA's legal basis for proposed guidelines), there is an accompanying rise in the relative likelihood of litigation from lawsuits filed by groups with

31

particular interest in the subject matter of the action." *Id.* Thus, NHTSA reasonably anticipates litigation regarding the proposed Phase 2 Guidelines. *See id.*[6]

While it is true that the proposed Phase 2 Guidelines were "voluntary and nonbinding," Visual-Manual NHTSA Driver Distraction Guidelines for Portable and Aftermarket Devices, 81 Fed. Reg. 87,656, 87,659 (Dec. 5, 2016) (ECF No. 20-4), that does not necessarily indicate that all parties will decline to explore litigation over them anyway. Indeed, the case cited by Plaintiff as purported proof that litigation would not ensue over voluntary, nonbinding guidelines just shows the extent to which some parties may pursue litigation over voluntary, nonbinding guidelines. *See Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 800 (D.C. Cir. 2006) (noting that plaintiffs' lawsuit was filed on March 10, 2004, and not resolved until June 23, 2006). Defendant avers that the materials for which it claimed work product protection were prepared in anticipation of litigation that would be brought by those who oppose the proposed Phase 2 Guidelines. *See* Suppl. Fish Decl. ¶ 9. Accordingly, Defendant's invocation of the work product doctrine was logical and proper.

## IV.     Defendant Has Released All Reasonably Segregable Information.

To establish that all reasonably segregable, nonexempt information has been disclosed, an agency need only show "with 'reasonable specificity'" that the information it has withheld cannot be further segregated. *Armstrong v. Exec. Off. of the President*, 97 F.3d 575, 578–79 (D.C. Cir. 1996). Plaintiff acknowledges that "NHTSA is entitled to a presumption that it complied with the requirement to disclose all reasonably segregable documents." Pl.'s Br. at 33. If an agency

---

[6]     NHTSA stresses that any anticipation of litigation with respect to the proposed Phase 2 Guidelines is not an indication that the agency considers such litigation properly maintained. Anticipating litigation simply entails a recognition that some parties may oppose an agency position and explore litigation avenues of challenging it. Whether any such legal challenges are justiciable or substantively viable is an issue more appropriately examined once any such claims are asserted, rather than in this hypothetical context.

provides a *Vaughn* index, provides a declaration addressing segregability, and states that the agency "conducted a line-by-line review of each document withheld in full and determined that 'no documents contained releasable information which could be reasonably segregated from the nonreleasable portions,'" then the D.C. Circuit holds that the agency satisfies its burden. *Johnson v. Exec. Off. for U.S. Att'ys*, 310 F.3d 771, 776 (D.C. Cir. 2002).

NHTSA explained that "[n]o reasonably segregable, non-exempt portions of documents have been withheld from Plaintiff" and that "NHTSA conducted a line-by-line review of the documents and determined that there is no additional meaningful, non-exempt information that can be reasonably segregated and released." Humphrey Decl. (ECF No. 20-5) ¶ 50. Indeed, "[i]f NHTSA further described the information withheld, the description could identify the actual exempt information that NHTSA has protected." *Id.* NHTSA explained, for instance, that it "redact[ed] exempt content from an internal email while retaining as much of the email header and discussion as reasonably possible." *Id.* This satisfies NHTSA's obligation. *See Johnson*, 310 F.3d at 776.

Plaintiff's case law to the contrary is readily distinguishable. In *Sierra Club v. Fish & Wildlife Service*, 523 F. Supp. 3d 24 (D.D.C. 2021) (Boasberg, J.), the defendant stated only that it "carefully reviewed the responsive records on a line-by-line and page-by-page basis." *Id.* at 39. In response, the plaintiff "highlighted several red flags undermining the presumption that Defendant has disclosed all reasonably segregable material." *Id.* Here, in contrast, Plaintiff's segregability argument relies solely on the purportedly conclusory nature of NHTSA's averments. Pl.'s Br. at 33–34. Meanwhile, NHTSA has not simply stated that it conducted a line-by-line review, but also explained that it "redact[ed] exempt content from an internal email while retaining as much of the email header and discussion as reasonably possible." Humphrey Decl. ¶ 50. Far

33

from a threadbare recital of a legal conclusion, NHTSA has explained how it has segregated non-exempt material.  *See Johnson*, 310 F.3d at 776.  Accordingly, Defendant is entitled to summary judgment.

## **CONCLUSION**

For the foregoing reasons and those set forth in its opening papers, Defendant respectfully requests that summary judgment be granted in its favor as to all claims and that Plaintiff be denied summary judgment.

Dated:  December 27, 2021

Respectfully submitted,

MATTHEW M. GRAVES, D.C. Bar No. 481052
United States Attorney

BRIAN P. HUDAK
Acting Chief, Civil Division

By:  /s/ *Douglas C. Dreier*
DOUGLAS C. DREIER, D.C. Bar No. 1020234
Assistant United States Attorney
Civil Division
U.S. Attorney's Office for the District of Columbia
555 4th Street, N.W.
Washington, D.C.  20530
(202) 252-2551
douglas.dreier@usdoj.gov

*Counsel for Defendant*

34